UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE STEVENS, | ) |
|         Plaintiff, | ) ) ) |
| v. | ) No. 22 C 5072 ) ) Judge Kennelly |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) |
|         Defendants. | ) ) |

**JOINT STATUS REPORT**

At the court's direction (Dkt. 112), the parties in this Freedom of Information Act case jointly submit this status report.

**I.    Customs and Border Protection**

1.    The court has directed CBP: (1) to search for records responsive to part two of plaintiff Jacqueline Stevens's "Underwood" FOIA request; and (2) to search for additional records responsive to part three of the Underwood request, including the email inbox of the procurement office employee whom CBP identified in its summary judgment materials. *See* Dkt. 102 (Opinion and Order) at 18-20, 24-25.

**CBP's Position**

2.    Regarding part *two* of the Underwood request, CBP has tasked numerous component offices to search for responsive records: (a) the Office of the Commissioner (in case someone in that office had oversight of the relevant topic); (b) the Office of Field Operations/U.S. Border Patrol/Air and Marine Operations (which are enforcement offices that could possibly have responsive records given the subject matter's potential nexus to encounters with non-citizens or other travelers); (c) Operations Support's sub-office called the Office of the Chief Medical Officer

(the *most* likely office to have responsive records, in CBP's view); and (d) Public Affairs (in case members of the media or public reached out to CBP with questions on the topic).

3. Air and Marine Operations has responded that it does not have any responsive records. The Office of the Chief Medical Officer has identified 17 custodians who are reasonably likely to have responsive records, and the effort is underway to compile any responsive records. CBP's FOIA office is waiting on a response from the remaining component offices. Below, Stevens criticizes CBP for not explaining why it did not previously search for records responsive to part two of the Underwood request. But CBP already explained that it interpreted the request not to be seeking CBP records. Dkt. 69 (CBP's Statement of Facts) ¶ 30. In its August 30, 2024 summary judgment decision (Dkt. 102), the court directed CBP to search for records responsive to part two, which is why CBP is now doing so (after first spending time this fall attempting and failing to work out a deal with Stevens regarding the scope of the search).

4. CBP has *not* tasked the following component offices: (a) the Office of Trade (which has no probable link to electronic health records); (b) Operations Support (which has no probable link to electronic health records, except for the sub-office called the Office of the Chief Medical Officer, which CBP *would* search as mentioned above); (c) International Affairs (which has no probable link to electronic health records) (d) Enterprise Services (which has no probable link to electronic health records, except for the Procurement Office, which is already being searched in response to part *three* of the Underwood request, *see* Dkt. 102 at 24-25, 105 ¶ 3); (e) the Office of Chief Counsel (because any responsive records from this office would almost certainly be privileged); (f) the Office of Congressional Affairs (whose connection to electronic health records was already satisfied in response to part *one* of the Underwood request, *see* Dkt. 102 at 10-18 (granting summary judgment to CBP with respect to part one of the Underwood request)); and (g)

the Office of Professional Responsibility (which has no probable link to electronic health records). None of these offices are reasonably likely to have responsive records.

5. Regarding part *three* of the Underwood request, CBP has processed more than 1,100 pages of potentially responsive records since the court's summary judgment ruling (Dkt. 102), and CBP has produced the responsive records to Stevens. CBP has more than 16,000 pages of potentially responsive records to review before completing its production. CBP plans to process these pages at a rate of 500 pages per month.

6. CBP cannot reasonably process more than 500 pages per month. CBP has 31 full-time FOIA employees handling its FOIA caseload, which currently consists of about 125,000 open FOIA requests (CBP received about 180,000 FOIA requests during the last fiscal year alone). More than 100 of CBP's FOIA requests have resulted in litigation, for which CBP is already obligated to process about 15,000 pages per month.

7. Ordering CBP to process more than 500 pages per month would impracticably force CBP to prioritize Stevens's request at the expense of other meritorious FOIA requests that were filed earlier in time, thereby unfairly delaying the requests of others. CBP has 265 open FOIA requests that it received before Stevens's and 15 FOIA lawsuits that predate this one.

8. In addition to the fact that a faster production schedule is impracticable, FOIA does not require it. Indeed, it would be inconsistent with FOIA's purpose to require CBP to divert resources from other individuals' FOIA requests in order to process more than 500 pages of records per month for Stevens. *White v. DOJ*, 16 F.4th 539, 544 (7th Cir. 2021) (500-pages-per-month production rate for larger FOIA requests "promotes efficiency and fairness by ensuring that the biggest requests do not crowd out smaller ones"); *Daily Caller v. Dep't of State*, 152 F.Supp.3d 1, 15 (D.D.C. 2015) ("the plaintiff's effort to accelerate review of its requests necessarily will

displace in processing priority those of third parties who submitted equally urgent requests before the plaintiff"); *Baker v. CFPB*, 2018 WL 5723146, *5 (D.D.C. Nov. 1, 2018) (ordering immediate processing of records "would harm the approximately 100 other requesters" who requested documents before plaintiff and "would erode the proper functioning of the FOIA system").

9. Indeed, CBP's practice of processing requests on a first-in, first-out basis is both consistent with FOIA and consistent with how other agencies typically process FOIA requests. *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976) (holding that first-in/first-out approach is consistent with agency's responsibilities under FOIA); *Daily Caller*, 152 F.Supp.3d at 8 ("In general, federal agencies process incoming FOIA requests on a first-in/first-out basis."). And courts have consistently recognized that disruption to agencies' normal processing schedules harms the public interest and is inconsistent with FOIA's purpose. *Nation Magazine v. Dep't of State*, 805 F.Supp. 68, 74 (D.D.C. 1992) (ordering plaintiff's FOIA request to be prioritized over other pending requests "would severely jeopardize the public's interest in an orderly, fair, and efficient administration" of FOIA); *EPIC v. DOJ*, 15 F.Supp.3d 32, 47 (D.D.C. 2014) (allowing plaintiff to "jump to the head of the line" would "upset the agency's processes and be detrimental to the other expedited requesters, some of whom may have even more pressing needs"); *Protect Democracy Project*, 263 F.Supp.3d 293, 303 (D.D.C. 2017) (requiring faster production "might actually disrupt FOIA's expedited processing regime rather than implement it").

**Stevens's Position**

10. In light of the age of the case and two dispositive motions on the issues of the adequacy of the search, Defendant's proposed production and search schedule is unreasonable.

11. On 11 November 2024 CBP emailed Plaintiff a production consisting of 32 pages which appear to be partial extracts from a government-wide circulation "Today's Acquisition News" and include "EHR" references for Veteran Affairs and other entities outside DHS. The "From" addresses are all acquisitionnewspulse@publicspendforum.net or vao@gotovoa.com. The "To" fields for all of these are redacted in their entirety, using exemptions b(6) and b(7)(c). There are a handful of abstracts with references to EHR systems; none include the underlying body of the text apparently available via a "Read More" button.

12. On 13 November 2024 CBP emailed Plaintiff a production consisting of 201 pages similar to the 11 November 2024 production.

13. CBP asserts it has 16,000 pages of "potentially responsive records" but has reviewed only 1,100.

14. The memo released indicates the agency uses the acronym "EMR" ("Electronic Medical Records") as well as "EHR" ("Electronic Health Records") to reference the CBP database referenced in Plaintiff's requests, whereas the recent release appears to search only for "EHR."

15. Plaintiff believes that several offices CBP has refused to search are likely to have responsive records: Enterprise Services, including but not limited to the Office of Information Technology, the Office of Chief Counsel (which would likely track international agreements on shared databases with foreign countries),and the Office of Congressional Affairs (for communications about EHR databases with other lawmakers).

16. DHS and CBP rely on cross-agency and cross-country interoperable biometric databases for purposes of its tracking migrants as well as Memoranda of Understanding for

procuring travel documents from foreign countries. International Affairs is, thus, likely to have responsive records.[1]

17. As published in *The Intercept*, "There is already precedent for immigration authorities relying on biometric databases to make immigration decisions based on flawed entries, or otherwise misusing personal diagnostic data. Take the Biometric Identification Transnational Migration Alert Program, or BITMAP, which since 2016 has been sucking in data from children who have crossed paths with immigration authorities outside of the United States…".[2]

18. In a recent interview on how the Trump administration might operationalize mass deportations, a senior civil servant employee at Immigration and Customs Enforcement referenced these biometric databases and related agreements.[3]

19. CBP's searches of Office of Procurement and other records system responsive to Stevens' second and third requests are not duplicative of searches for the first request. The first request is specific to communications with Rep. Underwood. The second and third requests could

---

[1] About CBP, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices/operations-support-assistant-commissioners-offices ("The Office of International Affairs is responsible for coordinating and supporting foreign initiatives, programs and activities within CBP. INA [sic] strives to extend U.S. borders by implementing programs and initiatives that promote anti-terrorism, global border security, non-proliferation, export controls, immigration and capacity building. INA focuses on international cooperation and strengthening multi- and bi-lateral relationships to achieve international agreements and joint efforts that both facilitate and secure legitimate trade.")

[2] John Washington and Jacqueline Stevens, "Representative Pushed to Create a Massive Migrant Health Database That No One Wants," *The Intercept,* January 4, 2020, https://theintercept.com/2020/01/04/border-patrol-cbp-migrant-health-database/. The passage relies on a hearing report statement by Homeland Security Committee Chair Rep. Bennie Thompson (D-MS). In 2012, a Colombia official disclosed an agreement with the U.S. to issue Columbian travel documents toDemocratic those on deportation flights, regardless of their citizenship, resulting in a 14 year-old U.S. citizen gaining legal entry to Colombia, despite her having no connection to the country and not speaking Spanish. Juan Carlos Llorca & Linda Stewart Ball, "Texas teen deported to Colombia reunites with mom," Associated Press (Jan. 7, 2012), https://apnews.com/article/texas-colombia-immigration-ce46e908a83d4bbdad1ee54a2344d38d

[3] Nadia Reiman, "Act One: The Largest Deportation Operation in American History," *This American Life* (Nov. 8, 2024), https://www.thisamericanlife.org/846/transcript, interviewing Jason Houser ("JH"). (Reiman: "So who are the first people who would be deported, like, in the first hundred days? JH: Haitians and Guatemalans….These countries take back the most flights. So I have an ability to remove-- at volume-- individuals. A lot of them have entered through pathways that we've developed, where we've gained biometric, we've gained vetting,...We're going to find nationalities that are easily removable...You've got to hold them, detain them, put them in hotels. It's very staff-intensive. So I'm going to target down on single adults and nationalities where I know the country will take them back very, very quickly.")

elicit records of communications with contractor lobbyists, representatives, DHS employees, and others interested in creating a CBP biometric "health" or "medical" databases. Complaint, ECF 1, September 16, 2022, ¶¶29-30. (The article Stevens co-authored for *The Intercept* indicates that the CBP database Underwood referenced purported to be for "health" but had no health or medical protocols and was opposed by immigrant rights groups; the groups were unaware of Underwood's proposal until interviewed.)[4]

20. Due to her ongoing scholarship and publications on government misconduct and corruption in federal procurement tied to Homeland Security, the records Stevens is seeking continue to be very important to her research.[5]

21. Plaintiff strenuously disagree with Defendants' position normalizing the processing of 500 pages of responsive records in litigation. *First*, the Act requires federal agencies to make their records **promptly available** to any person who makes a proper request for them. 5 U.S.C. § 552(a)(3)(A). Nowhere in the Act did Congress create an exemption from the "prompt" production mandate while agencies are in litigation. After two years of litigation and two Rule 56 motions Defendant still has over 15,000 pages to "process." The proposed "500 page a month" scheme would thus span this litigation for additional 30 months. Defendant's position defies credulity. *Second*, Plaintiff appreciates that there are many important FOIA requests CBP processes, but the backlog of cases is the result of Defendant's own doing. Defendants' antiquated review capacities relying on manual processing of requests and refusal to utilize technological advances to speed its review and production cannot trump the statutory mandates for timely and prompt production or

---

[4] Washington and Stevens, "Massive Database No One Wants," *supra*, note 2.
[5] E.g., Jacqueline Stevens, "Don't deter the huddled masses. Deter private prison kleptocrats who profit off them," *The News Tribune*, July 11, 2024. The essay was circulated widely by an MSNBC platform, https://www.msn.com/en-us/news/us/don-t-deter-the-huddled-masses-deter-private-prison-kleptocrats-who-profit-off-them-opinion/ar-BB1pNIc9. The article highlights an obscure federal regulation that builds profits into federal contracts at a rate higher than private markets.

dictate the Court's assessment of the review pace. Defendant could but refuses to avail themselves of reasonable technological capability and augment, temporarily or permanently, their review resources. *Third*, CBP's FOIA report for FY 2023 indicates a ratio of just one FOIA Full-time Employee or Equivalent ("FTE") available for every **1,972** FOIA requests received, in contrast with the DHS average of one FTE for **1046** requests, a ratio which is itself incommensurate with staffing sufficient to comply with the FOIA statute.[6] CBP's inability to promptly produce records as mandated by Congress reflects its failure to request funding sufficient to meet the deadlines Congress mandates. For example, for FY 2023 CBP requested an increase in funding to support hiring eight FTEs, solely for the purpose of reviewing body-camera video.[7] If CBP had eight more FOIA officers for FY 2023, it would have staffing of just one FTE for **1,761** requests.[8] *Fourth*, the cases cited by Defendant are inapposite. Neither case involved a procedural posture as the case at bar and neither "normalized" the idea that FOIA litigation should take between 5 to 7 years. In *White* the 7th Circuit affirmed an order upholding the FBI regulation and published practice of processing only 500 pages per month for large requests observing that the "ultimate likelihood of success is far too low. He challenges only the denial of his request that the FBI release 55,000 pages of documents immediately." *Id*. The Court observed that under § 552(a)(6)(D)(1), agencies may develop regulations "for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests." *Id.* And the Department of Justice has done so, allowing agencies such as the FBI to "designate additional processing tracks that

---

[6] Department of Homeland Security, FY 2023 Report to the Attorney General and the Director of Government Information Services, March 2024, 25-26, 30-31. https://www.dhs.gov/sites/default/files/2024-03/23_0325_fy23-FOIA_Annual_Report.pdf.

[7] Department of Homeland Security, Budget Overview, Congressional Justificiation, FY 2025, at CBP OS-48, https://www.dhs.gov/sites/default/files/2024-04/2024_0314_us_customs_and_border_protection.pdf.

[8] *See* DHS, FY 2023 Report to the Attorney General, *supra* note 6. By way of contrast, the Department of Education in fy 2023 received **46** requests/FOIA FTE and lacks the backlog of the DHS. Department of Education, FY 2023, Report to the Attorney General and the Director of Government Information Services, March 2024, 63-63, 80-81, https://www2.ed.gov/about/reports/annual/foia/foia-fy23.pdf.

distinguish between simple and more complex requests based on the estimated amount of work or time needed to process the request." 28 C.F.R. § 16.5(b). According to said regulation, the FBI has established a formal policy for requests exceeding 500 pages of documents is one of those contemplated tracks that allows for measured production of large FOIA requests. *Id* at *4. No such formal policy has been implemented by DHS or CBP: the 500-pages per month processing applies only to cases in litigation. The *White* court ruled that "the district court permissibly ruled that the FBI's application of its policy did not warrant an injunction. The policy does not prohibit all requests for immediate release of large amounts of documents. That in *White* "the district court reasonably concluded that the FBI was not improperly withholding documents by following its statutorily permissible policy and producing documents at 500 pages per month", this holding does not sanction every agency to adopt a 500-page processing rule. Nor does *White* or any other court to Plaintiff's counsel's knowledge have sanctioned penalizing requesters who elect to avail themselves of the judicial review and supervision afforded by the Act. Defendant continues to disregard the facts of this case. *Fifth*, Defendant's approach continues to disregard 5 U.S.C. § 552(a)(6)(C)(i) which provides that "If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records." Yet, CBP has not invoked the safety valve provision, *Appleton v. Food Drug Admin.*, 254 F. Supp.2d 6, 8 (D. DC 2003), nor has requested an *Open America* stay, *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976); *Elec. Frontier Found. v. Dep't of Justice*, 517 F. Supp.2d 111, 113 (D. DC 2007). Even if the Court is to consider the "500-page Proposal' as an implicit request for an *Open America* stay, CBP has failed to meet it burden to show both the existence of "exceptional circumstances" and that it has acted with due diligence. The *Open*

*America* court explained that the "exceptional circumstances" referred to in 5 USC § 552(a)(6)(C)(i) exist when an agency "is deluged with a volume of requests for information vastly in excess of that anticipated by Congress [and] when the existing resources are inadequate to deal with the volume of such requests within the [20 day] time limit of subsection (6)(A)[.]" *Id.* at 616. However, in the Electronic Freedom of Information Act Amendments of 1996 ("EFOIA"), Congress limited the meaning of "exceptional circumstances" to exclude "a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." *Ctr. for Pub. Integrity v. United States Dep't of State*, No. 05-2313, 2006 US Dist. LEXIS 22281, at *6 (D. D.C. April 24, 2006) (citing 5 USC § 552(a)(6)(C)(ii)). "It also has been recognized, based on the legislative history, that other circumstances in addition to FOIA request backlogs may be a basis for finding exceptional circumstances, including `resources being devoted to . . . the number of requests for records by courts or administrative tribunals.'" *Id.* at *6-7 (citing *Wilderness Soc'y*, 2005 US Dist. LEXIS 20042, at *21 which cited HR Rep. No. 104-795, at 24 (1996), reprinted in 1996 USCCAN 3448, 3467). Here, CBP does not even attempt to explain why it did not conduct a search for two parts of Plaintiff's request nor what "exceptional circumstances" justify a response time of five to seven years.

**II.     Executive Office of Immigration Review**

22.     EOIR has complied with the court's summary judgment order (Dkt. 103). As previously reported, EOIR referred several pages of records to ICE for review and processing. Dkt. 110 (Joint Status Report) ¶ 2. ICE completed its review and processing earlier this month.

23.     The parties agree that the only remaining issue with respect to EOIR is that the court directed EOIR to file an affidavit explaining its withholdings under the deliberative process

exemption. Dkt. 103 (Opinion and Order) at 15. EOIR has submitted that affidavit (Dkt. 104, Exhibit A), and it awaits the court's review.

### III.     Health and Human Services

**HHS's Position**

24.     HHS conducted a search for responsive records in the fall of 2022. Since December 2022, HHS has processed more than 12,800 pages of potentially responsive records.

25.     Most of the records have turned out not to be responsive to Stevens's FOIA request, but HHS has produced the responsive records—totaling about 520 pages—to Stevens.

26.     HHS has processed the potentially responsive records at an average pace of more than 500 pages per month. Just under 5,500 pages of potentially responsive records remain for HHS to process. Given the age of the case and the court's stated desire to reach a resolution, HHS is prepared to increase its processing rate to 750 pages per month beginning in December. At that pace, HHS would complete its production in about seven more months.

27.     HHS cannot reasonably process more than 750 pages per month. HHS currently has almost 4,300 open FOIA requests and is already processing more than 21,000 pages per month in response to them. On top of that number, HHS is processing around 13,000 pages of records per month in response to 83 FOIA requests that have proceeded to district court litigation. Requiring HHS to process more than 750 pages per month for Stevens would actually *subvert* FOIA's purpose by pushing Stevens's FOIA request to the head of the line in front of other properly submitted FOIA requests. Indeed, 501 of the FOIA requests that HHS is currently responding to were filed *before* Stevens's request. Prioritizing Stevens's request over those requests would be inconsistent with the general purpose of FOIA, as explained above in CBP's section. *E.g.*, *White v. DOJ*, 16 F.4th 539, 544 (7th Cir. 2021) (500-pages-per-month production rate for larger FOIA

requests "promotes efficiency and fairness by ensuring that the biggest requests do not crowd out smaller ones"); *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976) (holding that first-in/first-out approach is consistent with agency's responsibilities under FOIA); *Daily Caller v. Dep't of State*, 152 F.Supp.3d 1, 15 (D.D.C. 2015) ("the plaintiff's effort to accelerate review of its requests necessarily will displace in processing priority those of third parties who submitted equally urgent requests before the plaintiff").

**Stevens's Position**

28. Plaintiff incorporates her position on the issue of production speed in paragraph 21 above.

**IV.  Immigration and Customs Enforcement**

29. ICE's motion for summary judgment (Dkt. 87) and Stevens's cross-motion for summary judgment (Dkt. 96) are fully briefed and await the court's ruling.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: s/ Alex Hartzler
 ALEX HARTZLER
 Assistant United States Attorney
 219 South Dearborn Street
 Chicago, Illinois 60604
 (312) 886-1390
 alex.hartzler@usdoj.gov

 s/ Nicolette Glazer
NICOLETTE GLAZER
Attorney for Plaintiff
Law Office of Larry R. Glazer
Watt Plaza
1875 Century Park East #700
Century City, California 90067
(708) 435-0404
nicolette@glazerandglazer.com