UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) | No. 22 C 5072<br><br>Judge Kennelly |

**ICE'S REPLY TO PLAINTIFF'S RESPONSE TO ICE'S SUPPLEMENTAL AFFIDAVIT**

## Introduction

ICE has complied with the court's January 16, 2025 order directing it to conduct additional searches and to explain why it did not search additional component offices. As ICE's January 30, 2025 affidavit explains, ICE conducted the additional searches and did not search additional program offices because those offices are not likely to possess responsive records. Dkt 139. Stevens's response offers no reason to find otherwise. Dkt. 141.

## Background

In this Freedom of Information Act lawsuit, ICE filed an affidavit at the court's direction in January 2025, providing the court with additional information about ICE's search for responsive records. Dkt. 139. Plaintiff Jacqueline Stevens filed a response, Dkt. 141, and the court has directed ICE to reply. Dkt. 155.

## Argument

### I. Additional Searches

ICE's affidavit explains that it has complied with the court's order directing ICE to direct its Office of the Principal Legal Advisor to re-do its search for records relating to Toan Hoang and

to Pascal Charpentier's alias Pascual Carpenter. Dkt. 139 ¶¶ 2-3. The affidavit represents that, at the time of its filing on January 30, 2025, ICE had not received the results of the search but would process any potentially responsive records at the previously ordered rate of 1,500 pages per month. *Id*. Stevens's response—filed February 13, 2025—states that ICE has not produced any records. Dkt. 141 at 1 of 7; *see also id.* at 5-6 of 7. ICE produced the responsive records less than two weeks later, on February 27. Ex. A (Feb. 27, 2025 production letter). In other words, this issue has been resolved.

**II. Incomplete *Vaughn* Index**

Stevens complains in her response that, before the court issued its summary judgment ruling on January 16, 2025 (Dkt. 121), ICE had produced withheld records that were "not tracked on the Vaughn Index, as previously noted." Dkt. 141 at 6 of 7. The "as previously noted" language appears to be a reference to her summary judgment response memorandum, which identified withholdings that did not appear on the *Vaughn* index that ICE had submitted in support of summary judgment. Dkt. 96 at 7. The court has already noted that ICE corrected that omission by submitting a supplemental *Vaughn* index. Dkt. 121 at 3. Although the court ultimately found that the *Vaughn* index "lack[ed] sufficient detail" and ordered ICE "to produce the [withheld] records in full," Dkt. 121 at 23-24, that portion of the court's summary judgment order has been stayed pending appeal. Dkt. 146, 153. In other words, this issue has been stayed for now.

**III. Reason for Not Searching Additional Offices**

Stevens's main argument is that ICE's affidavit "still withholds information on which specific databases and officials ICE officials rely on to access the systems records [*sic*] still not released to me, such as the I-213 arrest reports, as well as: (a) detainee grievances; (b) detainee records on commissary accounts and work program participation; and (c) email[s] on claims of

U.S. citizenship." Dkt. 141 at 6 of 7 (emphasis omitted). This seems to refer to the court's earlier finding that, on summary judgment, ICE had not adequately explained "why no other record system was likely to produce responsive documents related to prison grievances, commissary account data, and work program participation." Dkt. 121 at 14. The court accordingly directed ICE to "either redo the search or submit another declaration averring and explaining why no other program offices are likely to contain these specific responsive records." Dkt. 121 at 16. ICE has complied by taking the latter approach. As ICE's January 30 affidavit explains, ICE tasked the component offices Homeland Security Investigations, Enforcement and Removal Operations, and the Office of the Principal Legal Advisor—but not ICE's other three program offices—to search for records. Dkt. 139, Ex. A ¶ 5. The three offices that ICE did not task are the Office of Management and Administration, the Office of the Chief Financial Advisor, and the Office of Professional Responsibility. *Id.* ICE did not task them for the reasons below.

**A. Office of Management and Administration**

As ICE's January 30 affidavit explains, the Office of Management and Administration identifies and tracks ICE's performance measurements, leads recruitment efforts, directs and maintains ICE's budget, and directs and maintains ICE's budgets for expenditures, accounting and finance, procurement, facilities, property, and policy and privacy. Dkt. 139, Ex. A ¶ 8. ICE did not task this office to search for records because the office's mission is "technical support and financing." *Id.* ¶ 10. Immigration enforcement and detention do not fall under the office's portfolio, and the office does not maintain detention records such as prison grievances, commissary account data, or work program participation. *Id.* Stevens does not challenge ICE's reasoning in her response. Dkt. 141.

**B. Office of the Chief Financial Advisor**

The affidavit also explains that the Office of the Chief Financial Advisor manages ICE's physical resources and locates resources for ICE's operational components. Dkt. 139, Ex. A ¶ 11. ICE did not task this office to search for records because the office's mission involves oversight of budgeting, accounting, and finance. *Id.* ¶ 12. Immigration enforcement and detention do not fall under the office's portfolio, and the office does not maintain detention records such as prison grievances, commissary account data, or work program participation. *Id.* Stevens does not challenge ICE's reasoning in her response. Dkt. 141.

**C. Office of Professional Responsibility**

Finally, the affidavit explains that the Office of Professional Responsibility is responsible for upholding the agency's professional standards, conducting independent reviews of ICE programs and operations, and investigating allegations of employee and contractor misconduct. Dkt. 139, Ex. A ¶ 13. ICE did not task this office to search for records, because its mission is to ensure that ICE adheres to its professional standards. *Id.* ¶ 18. Immigration enforcement and detention do not fall under the office's portfolio, and the office does not maintain records of prison grievances, commissary account data, or work program participation. *Id.*

Stevens responds that it "defies credulity" that the Office of Professional Responsibility would not have records of prison grievances, because the office's mission is to investigate allegations of employee misconduct. Dkt. 141 at 2 of 7. But ICE's National Detention Standards document directs the detention facilities themselves to maintain grievance records. *See* Exhibit B (Section 6.2 of National Detention Standards, publicly available at ice.gov/doclib/detention-standards/2011/6-2.pdf). As the document states, "Accurate records shall be maintained for filed grievances and their resolution in a grievance log and the detainee's detention file." *Id.* at 414.

Moreover, "Each facility shall maintain a grievance log that shall be subject to regular inspection by the Field Office Director and ICE headquarters staff." *Id*. at 419. These records would accordingly be under the control of ICE's Enforcement and Removal Operations component, which in fact ICE tasked to search for records. Although the Office of Professional Responsibility might sometimes have occasion to review grievance records, these would be copies—the holder of the records is Enforcement and Removal Operations.

**Conclusion**

For the above reasons, and for the reasons in ICE's January 2025 affidavit (Dkt. 139), the court should find that ICE has complied with its January 16, 2025 order with respect to the portion of the order directing ICE to conduct additional searches and to provide additional explanations.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Alex Hartzler
ALEX HARTZLER
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-1390
alex.hartzler@usdoj.gov

# Exhibit A

*Office of Information Governance and Privacy*

**U.S. Department of Homeland Security**
500 12th St., SW
Washington, D.C. 20536




February 27, 2025

Nicolette Glazer Esq.
Law Office of Larry R Glazer
1999 Avenue of the Stars # 1100
Century City, CA 90067

**RE: <u>Stevens v. ICE 1:22-cv-05072</u>**
**ICE FOIA Case Number 2023-ICLI-00003**
**Supplemental Interim Release**

Dear Ms. Glazer:

This letter is a supplemental interim response to your client's Freedom of Information Act (FOIA) requests to U.S. Immigration and Customs Enforcement (ICE). You seek records relating to the following Freedom of Information Act requests: 2022-ICFO-08985, 2020-ICFO-09447, and 2022-ICFO-27065. ICE has considered your request under the FOIA, 5 U.S.C. § 552.

FOIA request 2022-ICFO-08985 seeks:

1) All records of all grievances filed by Mr. Hoang, orally or in writing and under the control of ICE or its components, including county jails or private prisons with which ICE has contracted.
2) Commissary account data, including but not limited to information tracking funds reimbursed to Mr. Hoang on release from custody.
3) Work program participation documents and payment records.
4) All correspondence, notes, and other records pertaining to assertions or findings of U.S. citizenship from all databases, including records tied to proceedings in Los Angeles in 1999.
5) Communications with police, jails, prisons about Mr. Hoang's arrest and detention.
6) Screen shots of all tabs for interfaces associated with databases likely to have records responsive to this request.
7) All email, faxes, notes, and all other analyses and records tied to ICE investigations or findings for any deportation orders or arrests of Mr. Hoang.

FOIA request 2022-ICFO-09447 seeks:

1. records of all grievances filed, orally or in writing and under the control of ICE or its components, including county jails or private prisons with which ICE has contracted

2. Commissary account data, including but not limited to information tracking funds reimbursed on release from custody
3. Work program participation documents and payment records
4. All correspondence, notes, and other records pertaining to assertions or findings of U.S. citizenship from all databases
5. Communications with police, jails, prisons, arrests and detention
6. Screen shots of all tabs for interfaces associated with databases likely to have records responsive to this request
7. All email, faxes, notes, and all other analyses and records tied to ICE investigations or findings for any deportation orders or arrests of Miguel Silvestre, A#077-166-008, date of birth 02/16/1978

FOIA request 2022-ICFO-27065 seeks:

1. All system records and other items maintained, produced, or distributed by ICE, including ICE trial attorneys and HQ, pertaining to Pascal Charpentier. His date of birth is January 21, 1972. His country of birth is Germany. His "alien" number was 029001711 and in 2016 he was given this number: 020578103. I am interested in all system records pertaining to Mr. Charpentier and all ICE correspondence with other government agencies, individuals, or attorneys pertaining to Mr. Charpentier as well
2. All records of all grievances filed by Mr. Charpentier orally or in writing and under the control of ICE or its components, including county jails or private prisons with which ICE has contracted
3. Commissary account data, including but not limited to information tracking funds reimbursed to Mr. Charpentier on release from custody
4. All correspondence, notes, and other records pertaining to assertions or findings of U.S. citizenship, including but not limited to entries into PLAnet
5. All ICE Fugitive Operation notes, memorandums, text messages, and other information in any medium related to the search and arrest of Mr. Charpentier. This includes but is not limited to database search protocols on which agents relied for information leading to the arrest
6. I am seeking all instructions in any form on which ICE employees relied in their search for the information that led to the arrest of Mr. Charpentier.
7. Screen shots of all tabs for interfaces to databases searched for information responsive to this request

ICE has considered your requests under the FOIA, 5 U.S.C. § 552.

A search of the Office of Principal Legal Advisor located records that were potentially responsive to your request. For this production ICE reviewed 142 pages of potentially responsive documents. Of the 142 pages, ICE has determined that 53 pages are duplicates, 8 pages were deemed non-responsive. The remaining 81 pages will be withheld in part pursuant to FOIA Exemptions 5, 6, and 7(C) and 7(E) as described below. A total of 81 pages have been Bates numbered 2023-ICLI-00003 2803 through 2023-ICLI-00003 2883.

**FOIA Exemption 5** protects inter-agency or intra-agency memorandums or letters which not be available by law to a party other than an agency in litigation with the agency. The deliberative

process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel. The attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation. The attorney-client privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice. It applies to facts divulged by a client to his attorney, and encompasses any opinions given by an attorney to his client based upon, and thus reflecting, those facts, as well as communications between attorneys that reflect client-supplied information. The attorney-client privilege is not limited to the context of litigation.

ICE has applied FOIA Exemptions 6 and 7(C) to protect from disclosure the personally identifiable information of DHS employees and third parties contained within the records.

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right to privacy. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

**FOIA Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity. That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

**FOIA Exemption 7(E)** protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. I have determined that disclosure of certain law enforcement sensitive information contained within the responsive records could reasonably be expected to risk circumvention of the law. Additionally, the techniques and procedures at issue are not well known to the public.

If you have any questions about this letter, please contact Assistant United States Attorney at Alex Hartzler at Alex.Hartzler@usdoj.gov.

Sincerely,

ROLANDO VELASCO JR

Digitally signed by ROLANDO VELASCO JR
Date: 2025.02.27 11:59:58 -05'00'

Rolando Velasco
Supervisory Paralegal Specialist

Enclosure: 81 pages

# Exhibit B

# 6.2 Grievance System

## I. Purpose and Scope

This detention standard protects a detainee's rights and ensures that all detainees are treated fairly by providing a procedure for them to file both informal and formal grievances, which shall receive timely responses relating to any aspect of their detention, including medical care.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. Detainees shall be informed about the facility's informal and formal grievance system in a language or manner they understand.
2. In their daily interaction, staff and detainees shall mutually resolve most complaints and grievances orally and informally.
3. Detainees shall be able to file formal grievances, including medical grievances, and shall receive written responses, including the basis for the decision, in a timely manner.
4. Detainees shall be able to file emergency grievances for incidents that involve an immediate threat to health, safety, or welfare, and shall receive written responses, including the basis for the decision, in a timely manner.
5. Detainees shall be able to appeal initial decisions on grievances to at least one higher level of review.
6. Facilities shall allow any ICE/ERO detainee dissatisfied with the facility's response to a grievance or those fearing retaliation to be able to appeal or communicate directly with ICE/ERO.
7. Accurate records shall be maintained for filed grievances and their resolution in a grievance log and the detainee's detention file.
8. No detainee shall be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.
9. The facility shall assist detainees with disabilities and other special needs in preparing and pursuing a grievance, including those with serious mental illness, known intellectual or developmental disabilities, or who are blind or have low vision.
10. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance,

including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Detainee Grievance Procedures" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-27, 6A-07, 6B-01.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.13 Staff-Detainee Communication"
- "5.1 Correspondence and Other Mail."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Written Procedures Required

Each facility shall have written policy and procedures for a detainee grievance system that:

1. establish a procedure for any detainee to file an informal or formal grievance;
2. establish a procedure to track or log all ICE detainee grievances separately from other facility populations;
3. establish reasonable time limits for:
   a. processing, investigating and responding to grievances;
   b. convening a grievance committee (or actions of a single designated grievance officer) to review formal complaints; and
   c. providing written responses to detainees who filed formal grievances, including the basis for the decision;
4. ensure a procedure in which all medical grievances are received by the administrative health authority within 24 hours or the next business day, with a response from medical staff within five working days, where practicable;
5. establish a special procedure for time-sensitive, emergency grievances, including having a mechanism by which emergency medical grievances are screened as soon as practicable by appropriate personnel;
6. ensure each grievance receives appropriate review;
7. provide at least one level of independent appeal that excludes individuals previously involved in the decision making process for the same grievance;
8. include guarantees against reprisal; and
9. ensure information, advice and directions are provided to detainees in a language or manner they can understand, or that interpretation/translation services are utilized.

### B. Informing Detainees about Grievance Procedures

The facility shall provide each detainee, upon admittance, a copy of the detainee handbook and local supplement (see also standard "6.1 Detainee Handbook"), in which the grievance section provides notice of the following:

1. The expectation that, to the greatest extent possible, complaints and grievances shall be handled orally and informally by staff in their daily interaction with detainees (at all times, the detainee shall be granted the right to file a formal grievance and pursue the formal grievance process);
2. The right to file a grievance, including medical grievances, both informal and formal;
3. The process for filing emergency grievances;
4. The procedures for filing and resolving a grievance, including the availability of assistance in preparing a grievance (assistance for detainees with impairments or disabilities, interpretation/translation services for detainees with limited English proficiency (LEP) and assistance for detainees with limited literacy);
5. The procedures for filing and resolving an appeal, including the right to appeal to specified higher levels if the detainee disagrees with the lower decisions;
6. The procedures for contacting ICE/ERO to appeal a decision;
7. The policy prohibiting staff from harassing, disciplining, punishing or otherwise retaliating against any detainee for filing a grievance or contacting the Office of the Inspector General (OIG); and
8. The opportunity at any point to file a complaint directly to the Department of Homeland Security (DHS) OIG about staff misconduct, physical or sexual abuse or civil rights violations; complaints may be filed by calling the DHS OIG Hotline at 800-323-8603 or by writing to: Department of Homeland Security Attn: Office of the Inspector General Washington, DC 20528

## C. Grievance Procedures

### 1. Informal Grievances

Informal grievance resolution offers a detainee the opportunity to expediently resolve his/her cause for complaint before resorting to the more time-consuming written formal procedure. Staff at every facility shall make every effort to resolve a detainee's complaint or grievance at the lowest level possible, in an orderly and timely manner.

The facility administrator, or designee, shall establish written procedures for detainees to orally and informally present the issue of concern (as addressed in standard "2.13 Staff-Detainee Communication"). Upon request, additional assistance will be provided for detainees with impairments or disabilities, interpretation/translation services for detainees who are LEP, and assistance for detainees with limited literacy. Detention facility staff is encouraged to provide assistance if a detainee cannot properly communicate their concern.

A detainee is free to bypass or terminate the informal grievance process at any point and proceed directly to the formal grievance stage.

If an informal grievance is resolved, the employee need not provide the detainee written confirmation of the outcome, but shall document the result for the record in the detainee's detention file and in any logs or data systems the facility has established to track such actions.

Staff members who receive a detainee's informal complaint or grievance shall:

a. attempt to resolve the issue informally, if the issue is within his/her scope of responsibility; or
b. notify the appropriate supervisor of the grievance as soon as practical.

The supervisor may try to resolve the matter or advise the detainee to initiate a written grievance.

If the grievance is resolved at this informal level, the individual who resolved the issue shall document the circumstances and resolution in the detainee's detention file and in the facility's grievance log.

### 2. Emergency Grievances

Each facility shall implement written procedures for identifying and handling a time-sensitive emergency grievance that involves an immediate threat to health, safety or welfare. Written procedures shall also cover urgent access to legal counsel and the law library. All staff shall be trained to respond appropriately and in an expeditious manner to emergency grievances. Once the receiving employee determines that the detainee is raising an issue requiring urgent attention, emergency grievance procedures shall apply. Translation and interpretation services shall be made available to those who need it.

Emergency grievances may be brought by a detainee to a designated grievance officer (GO) or directly to the facility administrator or their designee. If these personnel are not available, a shift supervisor may be informed of the complaint.

A report of the grievance, including the nature of the complaint, the name of the detainee and the action taken to resolve the issue, shall be prepared in written form and forwarded to the facility administrator, or designee.

If the facility administrator determines that the grievance is not an emergency, standard grievance procedures shall apply.

All emergency grievance reports, to include the circumstances of the grievance and the resolution, shall be placed in the detainee's detention file and documented in the facility's grievance log.

Medical emergencies shall be brought to the immediate attention of proper medical personnel for further assessment. If it is determined that it is not a medical emergency, standard grievance procedures shall apply.

### 3. Formal Written Grievances

The detainee may file a formal grievance at any time during, after, or in lieu of lodging an informal complaint. The facility may not impose a time limit on when a detainee may submit a formal grievance.

In preparing and pursuing a grievance, the facility administrator, or designee, shall ensure procedures are in place to provide the assistance to detainees with impairments or disabilities, interpretation/translation services for detainees who are LEP, and assistance for detainees with limited literacy.

Facility grievance procedures shall be communicated to a detainee in a language or manner the detainee can understand. All written materials provided to detainees shall be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Staff shall provide the number of forms and envelopes requested by the detainee. Within reason, detainees are not limited in the number of forms and envelopes they may request.

Each facility shall establish three levels of formal grievance review. These reviews shall consist of: 1) GO review; 2) grievance appeals board (GAB) review; and 3) appellate review. ICE will issue guidance on the designation of representatives and additional guidelines for conducting hearings.

a. Grievance Procedure Guidelines

1) To prepare a grievance, a detainee may obtain assistance from another detainee, the housing officer or other facility staff, family members or legal representatives. Staff shall take reasonable steps to expedite requests for assistance from these other parties.

2) Another detainee, facility staff, family member, legal representative or non-governmental organization may assist in the preparation of a grievance with a detainee's consent.

a) If the detainee claims that the issue is sensitive or that his/her safety or well-being may be jeopardized if others in the facility learn of the grievance, the detainee

must:

- describe in the grievance the reason for circumventing standard procedures; and
- be given the right to seal the grievance in an envelope clearly marked "sensitive" or "medically sensitive," and submit it directly to the facility administrator, administrative health authority or designee.

b) Each grievance form shall be delivered by authorized facility personnel (not detainees) without being read, altered or delayed.

b. Grievance Process

1) GO review

a) Designated GO shall conduct the initial adjudication of a formal or informal grievance.

b) Detainee shall be provided with a written or oral response within five days of receipt of the grievance.

c) GO or designee shall note the grievance log with the following information:

- date grievance filed;
- name of detainee that filed grievance;
- nature of the grievance;
- date decision provided to detainee; and
- outcome of the adjudication.

2) GAB review

a) The detainee shall have the option to file an appeal if the detainee is dissatisfied with a GO decision, and shall be informed of that option.

b) The designated members of the GAB shall review and provide a decision on the grievance within five days of receipt of the appeal. The GAB shall not include any individuals named in the grievance.

c) The GAB shall issue a written decision to the detainee in all cases.

d) The GAB shall note the grievance log with the following information:

- date appeal filed;
- name of detainee that filed grievance;
- nature of the grievance;
- name of the GO that conducted the initial adjudication;
- date decision provided to detainee; and
- outcome of the adjudication.

e) Officials previously involved in adjudicating the grievance shall not participate on the GAB.

f) If the grievance involves a medical issue, at least one member of the GAB shall be a medical professional.

g) If the outcome of the appeal is unfavorable to the detainee, the GAB shall forward the grievance and all supporting documentation to the facility administrator within 24 hours of issuing a decision.

3) Appellate Review

a) The detainee shall have the option to file an appeal if the detainee is dissatisfied with a GAB decision, and shall be informed of that option.

b) The facility administrator, in some cases in conjunction with the Field Office Director, shall review the grievance appeal and issue a decision within five days of receipt of the appeal. A written decision shall be issued to the detainee in all cases and forwarded to the Field Office Director.

c) The appellate reviewer shall note the

grievance log with the following information:

- date appeal received;
- name of detainee that filed grievance;
- nature of the grievance;
- basis of the GAB decision;
- date decision provided to detainee; and
- outcome of the adjudication.

d) Facilities shall allow any ICE/ERO detainee dissatisfied with the facility's response to a grievance or those fearing retaliation to be able to appeal or communicate directly with ICE/ERO.

#### 4. Medical Grievances

Formal written grievances regarding medical care shall follow the same procedures per section "3. Formal Written Grievances" above, and shall be submitted directly to medical personnel designated to receive and respond to medical grievances at the facility. Medical grievances may be submitted in a sealed envelope clearly marked "medically sensitive."

Designated medical staff shall act on the grievance within five working days of receipt and provide the detainee a written response of the decision and the rationale. This record shall be maintained per the following section "D. Record-Keeping and File Maintenance."

## D. Record-Keeping and File Maintenance

Each facility shall maintain a detainee grievance log that shall be subject to regular inspection by the Field Office Director and ICE headquarters staff. Documentation shall include the following information:

- date grievance filed;
- name of detainee that filed grievance;
- nature of the grievance;
- date decision provided to detainee; and
- outcome of the adjudication.

Medical grievances shall be maintained in the detainee's medical file.

Facility staff shall assign each grievance a log number, enter it in the space provided on the detainee grievance form, and record it in the detainee grievance log in chronological order, according to the following stipulations:

1. the log entry number and the detainee grievance number must match;
2. the log shall include the receipt date and the disposition date; and
3. nuisance or petty grievances and grievances rejected or denied must also be logged with the appropriate notation and justification (for example, "petty").

A copy of the grievance disposition shall be placed in the detainee's detention file and provided to the detainee within five days.

ICE may audit grievance logs and individual cases as often as necessary to ensure compliance with the established grievance procedures and to assess the implementation of decisions within the facility. The ICE Office of Professional Responsibility may conduct trend analysis to determine the nature of grievances being filed across ICE facilities, resources expended on their resolution and outcomes.

## E. Established Pattern of Abuse of the Grievance System

If a detainee establishes a pattern of filing nuisance complaints or otherwise abusing the grievance system, the facility administrator may identify that person, in writing, as one for whom not all subsequent complaints must be fully processed. However, feedback shall be provided to the detainee, and records shall be maintained of grievances

"rejected."

For a detainee so identified by the facility administrator:

1. staff shall continue to attempt to resolve all informal oral grievances at the lowest level possible, as described above;
2. if designated staff at the facility's first grievance system level make the initial determination that the grievance is one that should not be fully processed due to its frivolous nature, they shall forward the grievance to the next grievance level;
3. if staff at that level concurs that the grievance is frivolous, the grievance shall be logged in the detainee grievance log showing the disposition (e.g., "rejected"), and a copy of the grievance shall be placed in the detainee's detention file;
4. the facility's written policy and procedures may also require that each rejected grievance be forwarded to the facility administrator for review or concurrence; and
5. the designated final authority may decide to return the grievance to a lower level for full processing.

If the GO designated to receive grievances believes the grievance is one that should not be fully processed, he or she shall document that determination and refer the grievance to the GAB for second-level review. If the GAB concurs, the grievance shall be logged in the detainee grievance log with "rejected" as the disposition, and a copy of the grievance shall be placed in the detainee's detention file.

## F. Allegations of Staff Misconduct

Upon receipt, facility staff must forward all detainee grievances containing allegations of staff misconduct to a supervisor or higher-level official in the chain of command. While such grievances are to be processed through the facility's established grievance system, CDFs and IGSA facilities must also forward a copy of any grievances alleging staff misconduct to ICE/ERO in a timely manner with a copy going to ICE's Office of Professional Responsibility (OPR) Joint Intake Center and/or local OPR office for appropriate action.

Facilities shall send all grievances related to sexual abuse and assault and the facility's decisions with respect to such grievances to the appropriate Field Office Director at the end of the grievance process.

## G. Retaliation Prohibited

Staff shall not harass, discipline, punish or otherwise retaliate against a detainee who files a complaint or grievance or who contacts the DHS Office of the Inspector General.

Actions are considered retaliatory if they are in response to an informal or formal grievance that has been filed and the action has an adverse effect on the resident's life in the facility.

Immediately following any indication or allegation of retaliation, the facility and ICE/ERO shall conduct an investigation of alleged acts of retaliation in a timely manner, and take all steps necessary to remedy any retaliation determined to have occurred.

## H. Review of Detainee Grievances

The ICE Office of Detention Oversight may review on a periodic basis a statistical sampling of grievances at a facility to evaluate compliance with this grievance standard and the associated grievance procedures; to assess the reasonableness of final decisions; and to generate data showing trends in the types of grievances, time frames for resolution and outcomes at various facilities. Detainee grievances will also be reviewed during ICE/ERO-initiated facility inspections.