UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUELINE STEVENS,          )
                                 )
           Plaintiff,       )
                                 )   No. 22 C 5072
      v.                )
                                 )   Judge Kennelly
UNITED STATES DEPARTMENT OF   )
HEALTH AND HUMAN SERVICES, *et al.*,  )
                                 )
          Defendants.   )

**MEMORANDUM IN SUPPORT OF**
**CBP AND HHS'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

Plaintiff Jacqueline Stevens has sued for the release of government records under the Freedom of Information Act, 5 U.S.C. § 552. She says that defendants U.S. Customs and Border Protection and U.S. Health and Human Services have failed to adequately search for responsive records and have improperly withheld records in response to her FOIA requests. But both agencies conducted adequate searches for responsive records, and HHS has not improperly withheld any material. (CBP has not improperly withheld any material, either, but the court's determination of that will have to wait, because CBP has not had sufficient time to prepare a *Vaughn* index, which is typically how an agency's withholdings are evaluated.) CBP is entitled to summary judgment on the adequacy of its search, and HHS is entitled to summary judgment in its favor entirely.

**Background**

**I.    CBP**

CBP received in December 2019 a FOIA request that Stevens submitted had submitted to the Department of Homeland Security seeking (1) communications between CBP and

1

Congresswoman Lauren Underwood or her staff, (2) communications with other DHS components or with HHS regarding the use of electronic health records systems, and (3) communications with outside individuals regarding the use of information technology to maintain health records data of people encountered by DHS. DSOF ¶ 5. She submitted two more FOIA requests in May 2022, seeking records regarding a person named Toan Hoang. DSOF ¶ 6.

The court previously granted summary judgment to CBP regarding: (1) its response to part one of the "Underwood" request; and (2) its response to both "Hoang" requests. Op. (Dkt. 102) at 18, 24. But the court denied summary judgment regarding parts two and three of the "Underwood" request. *Id*. at 24. CBP had interpreted part two of the "Underwood" request to be directed at its parent agency DHS, but the court disagreed and directed CBP to "promptly conduct a good-faith and reasonable search" for records responsive to part two. *Id*. at 24-25. As for part three, the court found that CBP's efforts to locate records were inadequate and directed CBP to "promptly conduct additional searches" for records responsive to part three, "including but not limited to the e-mail inbox of the previously identified Procurement Office employee." *Id*. at 25.

## II.      HHS

Stevens submitted a FOIA request to HHS in 2019 seeking records relating to Underwood's time as an HHS employee: (1) position announcements for jobs Underwood had at HHS; (2) reports, memoranda, or analyses Underwood produced there; (3) travel itineraries; and (4) expense reports. DSOF ¶ 41. HHS issued more than 30 monthly productions beginning in December 2022. DSOF ¶ 44. HHS has never previously moved for summary judgment in this case.

### Argument

The court should enter summary judgment in CBP's favor on the adequacy of CBP's search efforts and should grant summary judgment in HHS's favor entirely. CBP has made a good-faith

effort to cure the deficiencies in its initial search efforts, and Stevens has refused to reasonably negotiate after CBP's search efforts returned millions of pages of records—too many, by orders of magnitude, for CBP to realistically review. As for HHS, it has simply conducted an adequate search for records and has not improperly withheld any material.

Summary judgment is proper when "there is no genuine issue as to any material fact" and the movant "is entitled to judgment as a matter of law." *Stevens v. DHS*, 2014 WL 5796429, *4 (N.D. Ill. Nov. 14, 2014) (citing Fed R. Civ. P. 56(a)). FOIA cases typically are resolved on summary judgment because they often hinge on whether an agency's undisputed actions violated FOIA. *E.g., Bassiouni v. CIA*, 2004 WL 1125919, *2 (N.D. Ill. Mar. 31, 2004). Summary judgment should be granted if an agency provides the court with declarations or other evidence showing that it conducted an adequate search for records and that any responsive records were produced or are exempt from disclosure. *E.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (declarations "indicating the agency has conducted a thorough search" are sufficient to sustain agency's burden). Agency submissions in support of a summary judgment motion should be "accorded a presumption of good faith." *Demma v. DOJ*, 1996 WL 11932, *3 (N.D. Ill. Jan. 10, 1996) (citing *Carney*, 19 F.3d at 812). Here, CBP has provided a declaration outlining its curing of the deficiencies the court previously identified and Stevens's refusal to reasonably negotiate, and HHS has provided a declaration showing that it conducted an adequate search and that any withheld information is exempt from disclosure. Defendants' Statement of Facts (DSOF) ¶¶ 9-40, 42-76 (citing the Declarations of Patrick Howard and Brandon Lancey).

## I.    Adequate Searches

CBP and HHS have satisfied their burdens on summary judgment to demonstrate that they conducted adequate searches for responsive records, because they have shown that they made

good-faith efforts to conduct searches "reasonably calculated to uncover all relevant documents." *Hart v. FBI*, 1996 WL 403016, *2 (7th Cir. July 16, 1996); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (agency must make good-faith effort to conduct search using methods that "can be reasonably expected to produce the information requested"). An agency can establish the reasonableness of its search by "reasonably detailed, nonconclusory affidavits describing its efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006). Here, CBP and HHS have submitted reasonably detailed, nonconclusory affidavits describing their efforts, which are outlined below. DSOF ¶¶ 9-40, 42-49, 57-69, 76 (citing the Declarations of Patrick Howard and Brandon Lancey).

### A.     CBP

All that remains at issue for CBP are its efforts to search for records responsive to parts two and three of the "Underwood" request. Op. (Dkt. 102) at 24. Part two sought communications with other DHS components or HHS about the use of electronic health record systems. DSOF ¶ 5. Part three sought communications with outside individuals regarding using information technology to maintain health records data of people encountered by DHS. *Id*.

### 1.     Part Two of the "Underwood" Request

CBP had initially interpreted part two of the "Underwood" request to be directed to CBP's parent agency, DHS. DSOF ¶ 8. After the court denied summary judgment on part two in August 2024, CBP tried to negotiate with Stevens to see if the parties could reach an agreement about which component offices and custodians should be searched for responsive records. DSOF ¶ 9.

By late October 2024, the parties had been unable to reach any agreement. DSOF ¶ 10. CBP accordingly reported to the court that it planned to proceed with its search for records by searching the following component offices: (a) the Office of the Commissioner (in case someone

in that office had oversight of the relevant topic); (b) the Office of Field Operations/U.S. Border Patrol/Air and Marine Operations (which are enforcement offices that could possibly have responsive records given the topic's potential nexus to encounters with non-citizens or other travelers); (c) Operations Support's sub-office called the Office of the Chief Medical Officer (the *most* likely office to have responsive records, in CBP's view); and (d) Public Affairs (in case members of the media or public reached out to CBP with questions on the topic). *Id*.

By late November 2024, CBP had tasked those offices to search for responsive records using the following search terms: "E.H.R.," "E.M.R.," "Electronic Health Record," "Electronic Medical Record," "EHR," and "EMR." DSOF ¶¶ 11, 16. CBP did *not* task the following component officers: (a) the Office of Trade (which has no probable link to electronic health records); (b) Operations Support (which has no probable link to electronic health records, except for the sub-office called the Office of the Chief Medical Officer, which CBP did task as mentioned above); (c) International Affairs (which has no probable link to electronic health records); (d) Enterprise Services (which has no probable link to electronic health records, except for the Office of Acquisition, which was already being searched in response to part *three* of the "Underwood" request, as mentioned below); (e) the Office of Chief Counsel (because any responsive records from this office would almost certainly be privileged); (f) the Office of Congressional Affairs (whose connection to electronic health records was already satisfied in response to part *one* of the "Underwood" request); and (g) the Office of Professional Responsibility (which has no probable link to electronic health records). DSOF ¶ 12.

The search initially appeared to have returned about 492,147 documents totaling 1.3 million pages of potentially responsive records. DSOF ¶ 15. The court directed the parties in December 2024 to confer to try to reach a resolution on the scope of the search, and CBP

accordingly invited Stevens to propose additional search terms to narrow the universe of records that needed to be reviewed. DSOF ¶¶ 17-18. Stevens refused to provide additional search terms. DSOF ¶ 18.

### 2. Part Three of the "Underwood" Request

After the court denied summary judgment on part three, CBP tasked its FOIA office with running a search of the emails Office of Acquisition employee that CBP had previously identified in its initial motion, using the search terms "Electronic Health Record," "EHR," and "E.H.R." DSOF ¶¶ 21-22. By late November 2024, CBP had processed more than 1,100 pages of potentially responsive records, had produced the responsive ones, and had identified more than 16,000 pages of potentially responsive records. DSOF ¶ 23.

### 3. Settlement Efforts

After a virtual settlement conference in early 2025, the court told CBP to identify the volume of records that had been collected from its Office of Acquisition, and CBP determined that the volume from that office was 26,012 documents totaling more than 2.3 million pages. DSOF ¶¶ 24-25. (The reason that number is larger than the number that initially appeared to have been returned from *all* the component offices is that only a portion of the returned records had initially been ingested into CBP's eDiscovery software for analysis. DSOF ¶ 25. The total number of pages that actually came back from all the component offices is actually in the tens of millions. DSOF ¶ 25.) Excluding documents previously produced and documents exceeding 100 pages, the remaining number of records from the Office of Acquisition was 21,596 documents totaling 180,405 pages. DSOF ¶ 26. By this point, CBP's efforts to locate records responsive to parts two and three of the "Underwood" request had effectively merged. DSOF ¶ 24.

The settlement conference revealed that Stevens's primary interest was communications between CBP and outside contractors such as General Dynamics, so CBP applied the search term "General Dynamics" to the under-100-page universe from the Office of Acquisition, which yielded 230 documents totaling 5,766 pages. DSOF ¶ 27. The court directed CBP to begin processing those pages, and CBP began doing so, but it also invited Stevens in March 2025 to propose additional or different search terms. DSOF ¶ 28. CBP completed that production (with the exception of some unwieldy Excel files) by January 2026. DSOF ¶ 29.

By mid-January 2026, the parties had failed to agree on what to do with the remaining huge universe of potentially responsive records discussed above. DSOF ¶ 31. CBP proposed that: (1) Stevens would propose additional search terms for CBP to apply to the under-100-page documents from the Office of Acquisition; (2) CBP would apply those search terms to determine how many records the terms yielded; (3) the parties would negotiate which terms to use based on that volume; and (4) CBP would process the resulting records at the expedited rate of 750 pages per month; (5) the parties would present any remaining issues to the court. *Id*. Stevens did not accept CBP's proposal. *Id*.

At a status hearing in late January 2026, Stevens proposed 15 search terms, and CBP applied them all to the *entire* universe of millions of pages of potentially responsive records that it compiled in the wake of the court's 2024 summary judgment ruling. DSOF ¶¶ 32-34. Only one search term ("@gdit.com") yielded hits, and most of those records had already been produced, but CBP processed the remaining records and produced the responsive ones. DSOF ¶¶ 34-35. Stevens proposed that CBP apply her 15 search terms to four particular locations: (a) the Office of the Assistant Commissioner of Congressional Affairs; (b) the office of the Executive Director of Public Policy; (c) the Office of the Intergovernmental Public Liaison; and (d) any sub-offices with

the Office of Acquisition that were not previously searched. DSOF ¶ 32. The first office's connection to electronic health records was already satisfied in response to part *one* of the "Underwood" request, on which CBP won summary judgment. DSOF ¶ 36. The second and third offices sit under the umbrella of the Office of the Commissioner, which CBP previously tasked in 2024. DSOF ¶¶ 37-38. And the fourth office had previously provided the FOIA office with custodians directly involved in electronic health records who yielded millions of pages. DSOF ¶ 39.

CBP reported in early February 2026 that it stood ready to apply additional search terms to the enormous universe of potentially responsive records. DSOF ¶ 40.

### 4. Adequacy

All of the above shows that CBP made adequate efforts to cure the deficiencies identified in the court's 2024 summary judgment ruling and that Stevens refused to reasonably engage with CBP's efforts to provide records. Absent agreement from Stevens on search terms to narrow the enormous universe of potentially responsive records, her request is too burdensome to require CBP to produce anything further. An agency "need not honor a request that requires an unreasonably burdensome search." *AFGE v. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990); *see also Center for Immigration Studies v. USCIS*, 628 F.Supp.3d 266, 268 (D.D.C. 2022) (agency "need not respond to requests that entail an unduly burdensome effort of review"). In *Center for Immigration Studies*, the court granted summary judgment to the agency when its searches returned 1.6 million pages. 628 F.Supp.3d at 272, 275 (noting that the FOIA requests at issue "would force USCIS to review and produce millions of pages"). Here, as explained, CBP's searches to find records responsive to Stevens's FOIA request has yielded *tens* of millions of pages of potentially responsive records. DSOF ¶¶ 9-25. CBP has reasonably asked Stevens to provide

8

search terms to narrow the huge universe of potentially responsive records, and Stevens has for the most part refused to do so. DSOF ¶¶ 18, 31, 40; *see Stevens v. State*, 20 F.4th 337, 342 (7th Cir. 2021) (affirming summary judgment for agency where Stevens waited too long to raise objections to agency's use of search terms). When Stevens *has* provided search terms, CBP has promptly applied them and produced responsive records. DSOF ¶¶ 27, 32-35. CBP has made adequate efforts to comply with its FOIA obligations. Requiring CBP to do more would be unduly burdensome, and an agency need not honor an unduly burdensome FOIA request. *AFGE*, 907 F.2d at 209.

### B.     HHS

Stevens submitted a FOIA request to HHS in 2019 seeking several categories of records from Congresswoman Lauren Underwood's time as an HHS employee: (1) position announcements for jobs Underwood had at HHS; (2) reports, memoranda, or analyses Underwood produced there; (3) travel itineraries; and (4) expense reports. DSOF ¶ 41. Stevens identified the time frame of the request as January 1, 2010, to January 22, 2017. *Id*.

### 1.     HHS's Initial Search

When Underwood was at HHS, she served the Assistant Secretary for Preparedness and Response, so HHS directed its search efforts to the current iteration of that office, which is now known as the Administration for Strategic Preparedness and Response. DSOF ¶ 42. To accomplish that search, the Office of the Secretary's Office of the Chief Information Officer searched for every email Underwood sent between January 1, 2010, and January 22, 2017. DSOF ¶ 43. The search for Underwood's emails yielded 76,128 items, which were de-duplicated and reviewed for responsiveness. *Id*. After de-duplication, HHS reviewed 18,824 pages of potentially responsive records and produced the responsive records over the course of more than 30 monthly

productions.  DSOF ¶ 44.

In addition, HHS liaised with personnel in the Administration for Strategic Preparedness and Response as well as the Assistant Secretary for Administration, Office of Human Resources to identify systems reasonably likely to contain responsive employment and travel-related records. DSOF ¶ 45.  To find employment records, HHS queried its official personnel and staffing systems that maintained records relating to federal employees' appointments, position classifications, and hiring documentation, using Underwood's name, position titles, and organizational affiliations. DSOF ¶ 46.  To find travel-related records, HHS queried, for records associated with Underwood during the relevant period, its travel-management systems used to authorize, book, and reimburse official government travel.  DSOF ¶ 47.  The searches yielded around 92 pages of responsive records, which HHS produced in its first two monthly productions in December 2022 and January 2023.  DSOF ¶ 48.

### 2.    HHS's Supplemental Search

Following correspondence between counsel in late 2025 and early 2026, HHS undertook additional searches to ensure that all locations reasonably likely to contain responsive records had been adequately searched.  DSOF ¶ 57.

As part of that supplemental effort, HHS conducted additional outreach to the Office of the Assistant Secretary for Administration's Office of Human Resources to identify any records relating to position announcements associated with Underwood's positions at HHS.  DSOF ¶ 58. Personnel in that office then searched the Department's Enterprise Human Capital Management system to confirm Underwood's employment history, including that she applied for an initial appointment in 2010 and for a merit promotion in 2014.  DSOF ¶ 59.  The office responded that HHS transitioned to a newer version of "USA Staffing" around 2017-2018, that historical records

10

were not migrated to that system, and that under Office of Personnel Management requirements, vacancy announcement records are retained for only three years, after which point they are deleted unless subject to a litigation hold. DSOF ¶ 60. HHS accordingly concluded that position announcements responsive to Stevens's request are no longer maintained and do not exist within HHS's control. DSOF ¶ 61.

HHS also conducted additional outreach to its Immediate Office of the Secretary, Office of Business Operations, to determine whether records relating to Underwood's travel itineraries and related travel documentation from 2010 to 2014 could be located. DSOF ¶ 62. The personnel in that office responded that, although records from that period would have originally been maintained within HHS's official travel and financial management systems, the office does not maintain access to travel documentation from the relevant period due to system and program transitions, including HHS's transition from GovTrip to Concur Government Edition in 2015 and changes to the government travel card program. DSOF ¶ 63. The office further explained that travel records—including itineraries, authorizations, and vouchers—are maintained in accordance with the National Archives and Records Administration General Records Schedule for travel records, which requires retention for six years and three months after payment. DSOF ¶ 64. HHS accordingly determined that the Immediate Office of the Secretary, Office of Business Operations would not reasonably be expected to have responsive records for the relevant time period. DSOF ¶ 65.

HHS also sought to identify records relating to Underwood's travel expense reports, vouchers, and related financial documentation, through the Immediate Office of the Secretary, Office of Business Operations and relevant financial and travel systems. DSOF ¶ 66. The personnel in that office advised that records such as travel vouchers, local vouchers, expense

reports, receipts, and government travel card transactions from the relevant period would have been maintained in HHS's official travel and financial systems and subject to the same retention schedules described above. DSOF ¶¶ 67-68. HHS accordingly determined that it does not have responsive expense report records for the relevant time period. DSOF ¶ 69.

### 3. Referred Records

HHS issued its 32nd and final production last week, on March 13, 2026. DSOF ¶ 70. The production consisted of 20 pages of records that had previously been referred to other offices for consultation, and which were recently returned to HHS for final disposition. DSOF ¶ 71.

### 4. Adequacy

A search is adequate if it is the result of a "good faith effort" and is "reasonable in light of the request." *Stevens v. State*, 20 F.4th 337, 342 (7th Cir. 2021) (quotation omitted). Here, as shown above, HHS's search efforts were reasonable in light of the request: the efforts were reasonably calculated to uncover all potentially responsive records, and HHS searched all systems, databases, and offices reasonably likely to contain responsive records. DSOF ¶¶ 42-49, 57-69, 76.

## II. No Information Improperly Withheld

In producing records, HHS properly withheld various information protected from disclosure by one or more FOIA exemptions. 5 U.S.C. § 552(b); *DOJ v. Tax Analysts*, 492 U.S. 136, 150-51 (1989). Here, HHS redacted certain materials under Exemptions 5 and 6. DSOF ¶¶ 50-51, 54, 70-72.

### A. Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with an agency." 5 U.S.C. § 552(b)(5). From its monthly productions that began in December 2022 and ended in 2025, HHS

12

initially redacted certain information under Exemption 5. DSOF ¶¶ 50-51. But HHS subsequently withdrew its Exemption 5 withholdings and re-produced those pages with the Exemption 5 withholdings lifted. DSOF ¶ 51.

In the 20-page March 2026 production, HHS's Exemption 5 redactions consist of pre-decisional and deliberative internal agency communications, including discussions regarding proposed revisions to the National Emergency Repatriation Plan, potential updates to interagency rules, and possible protocols and policy changes. DSOF ¶¶ 70-73.

## B.     Exemption 6

Exemption 6 protects information when its release would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (courts broadly interpret Exemption 6 to encompass all information applying to a particular individual). To determine whether releasing information would constitute a "clearly unwarranted invasion of personal privacy," courts balance the interest of protecting a person's private affairs from unnecessary public scrutiny against the public's right to governmental information. *Lepelletier*, 164 F.3d at 46. The *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure would shed light "on the agency's performance of its statutory duties" or otherwise let citizens know what their government is up to. *Id.*

From its monthly productions that began in December 2022 and ended in 2025, HHS withheld material under Exemption 6, but the parties previously agreed that Stevens would not challenge HHS's "routine" Exemption 6 withholdings. DSOF ¶¶ 50, 54. Stevens has identified one redaction that she says is not "routine"; it appears on an email HHS produced that Underwood sent on November 3, 2016, in which Underwood wrote, "I got promoted! I'm now the Senior Advisor for Nicki in ASPR! Yay—," followed by a little more than one line of redacted text.

DSOF ¶ 55.  The redacted text contains information about Underwood's personal life.  DSOF ¶ 56.  HHS welcomes a request by the court to conduct an *in camera* review of the un-redacted email and stands ready to deliver the un-redacted email to chambers promptly upon request.

From its 20-page March 2026 production, HHS's Exemption 6 redactions consist of personal information, including personal cell phone numbers, the name of a potential candidate for a public health position, and other personal information such as personal health information. DSOF ¶¶ 70, 72, 74.  HHS has met its burden to show that its withholdings were appropriate. *Stevens*, 2014 WL 5796429 at *4 (summary judgment for agency is appropriate "if the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed") (quoting *Patterson v. IRS*, 56 F.3d 832, 836 (7th Cir. 1995)).  Should there be any question based on HHS's descriptions of the withheld material, HHS welcomes a request by the court to conduct an *in camera* review of un-redacted versions of the 20 pages in question.

### III.    Exempt Information Reasonably Segregated

FOIA directs that any "reasonably segregable" portion of a record must be produced after "deletion of the portions which are exempt."  5 U.S.C. § 552(b).  But if the proportion of non-exempt material is "relatively small and is so interspersed with exempt material that separation by the agency and policing of this by the courts would impose an inordinate burden," then the material remains FOIA-protected because, "although not exempt, it is not reasonably segregable."  *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 86 (2d Cir. 1979).  Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable materials.  *Stevens*, 2014 WL 5796429 at *9.  The court, nonetheless, must make an express finding on the issue of

segregability. *Patterson v. IRS*, 56 F.3d 832, 840 (7th Cir. 1995) (remanding where court made no segregability finding).

Here, HHS has released all reasonably segregable, non-exempt portions of the referred records produced on March 13, 2026: it has conducted a careful review and determined that all the withheld information is either exempt from disclosure or is not reasonably segregable, because any non-exempt information is inextricably intertwined with exempt material such that segregation is not possible without revealing protected information. DSOF ¶ 75. So HHS has met its burden of showing that it did not withhold any non-exempt information that was reasonably segregable. *See Matter of Wade*, 969 F.2d 241, 246 (7th Cir. 1992) (veracity of government's submissions regarding reasons for withholding records should not be questioned without evidence of bad faith).

## Conclusion

For the above reasons, the court should grant summary judgment in CBP's favor on the adequacy of its search and grant summary judgment in HHS's favor entirely.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov