UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE STEVENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 22 C 5072 |
| v. | ) |
| | ) Hon. Matthew F. |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) Kennelly |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S LOCAL RULE 56.1(b)(2) RESPONSE**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Northern District of Illinois, Plaintiff Jacqueline Stevens ("Plaintiff"), submits her response to CBP and HHS's LR 56.1 Statement of Material Facts in Support of Summary Judgment and her Local Rule 56.1(b)(3) Statement in Opposition to Defendants' Motion for Summary Judgment.

**I.    Plaintiff's Local Rule 56.1(b)(2) Response**

1. This is an action brought under the Freedom of Information Act (FOIA), and the court has subject matter jurisdiction under 5 U.S.C. § 552 and 28 U.S.C. § 1331. Answer (Dkt. 15) ¶ 3.

**RESPONSE**:

Admitted.

2. Venue is proper in this district because plaintiff Jacqueline Stevens resides in this district. Answer (Dkt. 5)

**RESPONSE**:

Admitted.

3. Plaintiff Jacqueline Stevens is a professor at Northwestern University. Answer (Dkt. 15) ¶ 5.

**RESPONSE**:

Admitted.

4. Defendants CBP and HHS are agencies of the executive branch (in CBP's case, a component of the Department of Homeland Security) within the meaning of 5 U.S.C. § 552(f). Answer (Dkt. 15) ¶¶ 16-17.

**RESPONSE**:

Admitted.

5. CBP received in December 2019 a FOIA request that Stevens had submitted to DHS, seeking (1) communications between CBP and Congresswoman Lauren Underwood or her staff, (2) communications with other DHS components or with HHS regarding the use of electronic health records systems, and (3) communications with outside individuals regarding the use of information technology to maintain health records data of people encountered by DHS. Ex. A (2024 Howard Decl.) ¶ 24.

**RESPONSE**:

Admitted.

6. Stevens submitted two more FOIA requests in May 2022, seeking records regarding a person named Toan Hoang. Ex. A (2024 Howard Decl.) ¶¶ 9, 18.

**RESPONSE**:

Admitted.

7. The court previously granted summary judgment to CBP regarding: (1) its response to part one of the "Underwood" request; and (2) its response to both "Hoang" requests. Dkt. 102 at 18 ("The Court

concludes that CBP is entitled to summary judgment on part one of Stevens's Underwood request."),
24 ("CBP is therefore entitled to summary judgment on the Hoang requests.").

**RESPONSE**:

Admitted.

8. CBP initially interpreted part two of the "Underwood" request to be directed to its parent
   agency DHS. Ex. A (2024 Howard Decl.) ¶ 26(b).

**RESPONSE**:

Disputed. CBP's claim that it interpreted part two of the "Underwood" request to be
directed exclusively to its parent agency is inconsistent with the plain language of the request, which
asks for "materials created by or received from other components of DHS" as well as
communications about "the establishment of an EHR for the use by offices of CBP." Dkt. 15 at ¶
29 (emphasis added). As the Court noted in its August 2024 summary judgment decision, there is no
"factual or logical support" for such a determination. Dkt. 102 at pp. 18-19.

9. After the court denied summary judgment on part two of the "Underwood" request (Dkt.
   102 at 24), CBP began attempting to negotiate with Stevens to see if the parties could
   reach an agreement about which component offices and custodians should be searched
   for responsive records. Dkt. 105 ¶ 3.

**RESPONSE**:

Admitted that the Court denied summary judgment on part two of the "Underwood"
request. Paragraph 9 is otherwise disputed on the basis that the cited material does not
establish the asserted fact.

10. By October 28, 2024, the parties had been unable to reach any agreement. Dkt. 109 ¶ 2. CBP
    accordingly reported to the court that it planned to proceed with its search for records by
    searching the following component offices: (a) the Office of the Commissioner (in case

someone in that office had oversight of the relevant topic); (b) the Office of Field Operations/U.S. Border Patrol/Air and Marine Operations (which are enforcement offices that could possibly have responsive records given the topic's potential nexus to encounters with non-citizens or other travelers); (c) Operations Support's sub-office called the Office of the Chief Medical Officer (the *most* likely office to have responsive records, in CBP's view); and (d) Public Affairs (in case members of the media or public reached out to CBP with questions on the topic). Dkt. 109 ¶ 2.

**RESPONSE**:

Admitted.

11. By November 20, 2024, CBP had tasked those offices to search for responsive records. Dkt. 115 ¶ 2; *see also* Ex. B (2026 Howard Decl.) ¶ 8.

**RESPONSE**:

Admitted.

12. CBP did *not* task the following component offices: (a) the Office of Trade (which has no probable link to electronic health records); (b) Operations Support (which has no probable link to electronic health records, except for the sub-office called the Office of the Chief Medical Officer, which CBP did task as mentioned above); (c) International Affairs (which has no probable link to electronic health records); (d) Enterprise Services (which has no probable link to electronic health records, except for the Office of Acquisition, which was already being searched in response to part *three* of the request, as mentioned below); (e) the Office of Chief Counsel (because any responsive records from this office would almost certainly be privileged); (f) the Office of Congressional Affairs (whose connection to electronic health records was already satisfied in response to part *one* of the Underwood request, *see* Dkt. 102 at 10-18 (granting summary judgment to CBP

with respect to part one)); and (g) the Office of Professional Responsibility (which has no probable link to electronic health records). Ex. B (2026 Howard Decl.) ¶ 9; *see also* Dkt. 115 ¶ 4.

RESPONSE:

Admitted that CBP did or did not task the component offices identified in ¶ 12 with a search, as described. Disputed that the cited material establishes the absence of a genuine dispute over whether the agencies identified have "no probable link to electronic health records." The claim of "no probable link" is further disputed because CBP has produced responsive documents identifying Enterprise Services as involved in EHR records. Plaintiff's Statement of Additional Facts at ¶ 20.

13. Air and Marine Operations responded that it did not have any responsive records. Ex. B. (2026 Howard Decl.) ¶ 10; see *also* Dkt. 115 ¶ 3.

**RESPONSE**:

Admitted.

14. The Office of the Chief Medical Officer identified 17 custodians who were reasonably likely to have responsive records, and by November 20, 2024, efforts were underway to compile any responsive records. Ex. B (2026 Howard Decl.) ¶ 11; *see also* Dkt. 115 ¶ 3.

**RESPONSE**:

Admitted.

15. CBP's taskings were thought to have yielded about 492,147 documents totaling 1.3 million pages of potentially responsive records. Ex. B. (2026 Howard Decl.) 12, see also Dkt. 140 ¶ 2.

**RESPONSE**:

Admitted.

16. The search terms CBP employed were: "E.H.R." (which yielded 5 hits), "E.M.R." (which yielded 0 hits); "Electronic Health Record" (which yielded 6,577 hits), "Electronic Medical Record" (which yielded 24,928 hits), "EHR" (which yielded 11,259 hits), and "EMR" (which yielded 361,980 hits). Ex. B (2026 Howard Decl.) ¶ 13; *see also* Dkt. 140 ¶ 4. (These are document counts, not page counts, and the numbers do not include "family members," for example attachments, which are included in the total number of documents mentioned above. *Id.*)

**RESPONSE**:

Admitted.

17. At an in-person status hearing on December 13, 2024, the court directed the parties to confer in good faith to try to reach a resolution on the scope of the search. Dkt. 119, 140 ¶ 14.

**RESPONSE**:

Admitted.

18. CBP accordingly invited Stevens to propose additional search terms to narrow the universe of records that needed to be reviewed, but Stevens refused to provide additional search terms. Dkt. 140 ¶ 6; Ex. B (2026 Howard Decl.) ¶ 14.

**RESPONSE**:

Admitted.

19. Regarding part three of the "Underwood" request, CBP initially determined that any work with outside individuals to develop the described data would go through CBP's procurement office, which is part of CBP's Office of Acquisition. Ex. A (2024 Howard Decl.) (needs cite)

**RESPONSE**:

Admitted.

20. The Office of Acquisition identified the employee who serves as the point of contact for electronic medical records, and that employee "confirmed that she has a clear recollection that she had no correspondence verbally or in writing on meetings and communications with private individuals for collecting, coordinating or maintaining health record data for those encountered or detained by DHS or any component of DHS (CBP)." Ex. A (2024 Howard Decl.) ¶ 28.

**RESPONSE**:

Admitted.

21. After the court denied summary judgment on part three of the "Underwood" request (Dkt. 102 at 24), CBP searched the emails of the previously identified Office of Acquisition employee. Ex. B (2026 Howard Decl.) ¶ 15; *see also* Dkt. 105 ¶ 3.

**RESPONSE**:

Admitted.

22. The search terms were "Electronic Health Record," "HER," and "E.H.R." Ex. B. (2026 Howard Decl.) ¶16.

**RESPONSE**:

Admitted.

23. By November 20, 2024, CBP had processed more than 1,100 pages of potentially responsive records and had produced the responsive records, and CBP had identified more than 16,000 pages of potentially responsive records. Ex. B (2026 Howard Decl.) ¶ 17; *see also* Dkt. 115 ¶ 5.

**RESPONSE**:

Admitted.

24. CBP's search of its Office of Acquisition eventually yielded more than 2.3 million pages of potentially responsive records. Ex. B (2026 Howard Decl.) ¶ 19. By early 2025 (when

the court asked CBP how many pages had been returned from the Office of Acquisition), CBP's efforts to locate records responsive to parts two and three of the "Underwood" request had effectively merged.

**RESPONSE**:

Admitted.

25. After a virtual settlement conference, the court directed CBP to identify the volume of records that had been collected from its Office of Acquisition. Ex. B (2026 Howard Decl.) ¶ 19; *see also* Dkt. 147 ¶ 1. CBP determined that the total volume from that office was 26,012 documents totaling more than 2.3 million pages. Ex. B (2026 Howard Decl.) ¶ 19; *see also* Dkt. 147 ¶ 2. (The reason that number is larger than the number CBP previously reported for *all* the component offices was that the previously reported number turned out to be an undercount because only a portion of the returned records had been ingested into CBP's eDiscovery software for analysis, and the total number of pages that came back from all the component offices was actually in the tens of millions. Ex. B (2026 Howard Decl.) ¶ 19; *see also* Dkt. 147 ¶ 2.)

**RESPONSE**:

Disputed. CBP filed inconsistent statements in status reports, calling into question the reliability of CBP's record and page assessments. Whereas CBP's March 2025 status report indicated its search yielded 230 documents totaling 5,766 pages, its August 2025 report said CBP had 441 documents that remain to be processed Dkt. 147 at ¶ 6; Dkt. 163 at ¶ 6.

26. Excluding any documents previously produced and any documents exceeding 100 pages, the remaining number of Office of Acquisition records was 21,596 documents totaling 180,405 pages. Ex. B (2026 Howard Decl.) ¶ 20; *see also* Dkt. 147 ¶ 3.

**RESPONSE**:

Disputed. See Response to paragraph 25.

27. The settlement conference revealed that Stevens's primary interest was communications between CBP and outside contractors such as General Dynamics, so CBP applied the search term "General Dynamics" to the under-100-page Office of Acquisition Universe, which yielded 230 documents totaling 5,766 pages. Ex. B (2026 Howard Decl.) ¶21; *see also* Dkt. 147.

**RESPONSE**:

Admitted, except that Plaintiff disputes CBP's representations about the number of documents and pages at issue, as it has submitted competing representations. See Response to paragraph 25.

28. The court directed CBP to begin processing those pages, Dkt. 151, and CBP began doing so, but it also invited Stevens in March 2025 to propose additional or different search terms. Dkt. 147 ¶¶ 5-6; Ex. B (2026 Howard Decl.) ¶¶ 22-23.

**RESPONSE**:

Admitted.

29. CBP had completed its production (with the exception of some unwieldy Excel files) by January 2026. Ex. B (2026 Howard Decl.) ¶ 24; *see also* Dkt. 189 ¶ 5.

**RESPONSE**:

Disputed. CBP admitted in the parties' February 5, 2026 status report that its production was not complete. Dkt. 201 at ¶¶ 10-15. CBP also sent a partial production in March of 2026, effectively admitting that its production was not complete in January. CBP further admits that there are "tens of millions" of potentially responsive documents. See DSOF ¶ 25.

30. CBP made efforts to provide Stevens with a sample of what the Excel files would look like if CBP did a "reverse redaction"—meaning that instead of having to redact thousands of lines of

irrelevant information, CBP would "extract" the smaller number of lines that might be responsive, but Stevens did not affirmatively respond. Ex. B (2026 Howard Decl.) ¶ 24.

**RESPONSE**:

Admitted.

31. By January 12, 2026, the parties had failed to reach any agreement regarding what to do with the remaining huge universe of potentially responsive records discussed above. Dkt. 189 ¶¶ 5-6. CBP proposed that: (1) Stevens would propose additional search terms for CBP to apply to the under-100-page documents from the Office of Acquisition that had not yet been reviewed; (2) CBP would apply those search terms to determine how many potentially responsive records the search terms yielded; (3) the parties would negotiate which terms to use based on that volume (4) CBP would process the resulting records at the expedited rate of 750 pages per month and would produce the responsive records subject to the application of any FOIA exemptions; (5) the parties would then present any remaining issues to the court. Dkt. 189 ¶ 7. Stevens did not accept CBP's proposal. Dkt. 189 ¶¶ 6-8.

**RESPONSE**:

Admitted.

32. At a status hearing held on January 28, 2026, Stevens proposed that CBP: (1) apply a certain set of search terms to the previously discussed existing large universe of millions of pages pulled from the Office of Acquisition (excluding documents of more than 100 pages); and (2) apply the same set of search terms to the following sub-offices: (a) the office of the Assistant Commissioner of Congressional Affairs; (b) the office of the Executive Director of Policy; (c) the Office of the Intergovernmental Public Liaison; and (d) any sub-offices within the Office of Acquisition that were not previously searched. Dkt. 201 ¶ 4.

**RESPONSE**:

Admitted.

33. Stevens's requested search terms were generaldynamics.com, @gdit.com, @ervingraves.com, @cgagroup.com, @acgadvocacy.com, @harbingerdc.com, @pennavenue.com, @potadv.com, @teamsubjectmatter.com, @vsadc.com, @federalstrategies.com, @nelsonmullins.com, @meltsnerstrategies.com, @align-strategies.com, and @bakerdonelson.com. Dkt. 201 ¶ 5.

**RESPONSE**:

Admitted in part. Disputed that this list of search terms is comprehensive. Dkt. 201 ¶ 24(b); Dkt 189, ¶¶7-8.

34. CBP applied the requested search terms to the records from the Office of Acquisitions and to the *entire* universe of even more millions of pages of potentially responsive records that it had initially pulled in the wake of the court's 2024 summary judgment ruling, and none of the search terms yielded any hits except for @gdit.com, which yielded 177 hits totaling 2,704 pages. Ex. B (2026 Howard Decl.) ¶¶ 26-28; *see also* Dkt. 201 ¶ 6.

**RESPONSE**:

Disputed. See Response to DSOF ¶ 25.

35. Many of those records had already been produced—recall the plan coming out of the February 2025 settlement conference to search for records containing the phrase "General Dynamics"— but CBP completed its processing of the remaining records and produced them on March 20, 2026. Ex. B (2026 Howard Decl.) ¶ 28; *see also* Dkt. 201 ¶ 6.

**RESPONSE**:

Admitted.

36. Stevens proposed that CBP search the office of the Assistant Commissioner of Congressional Affairs, but CBP's Office of Congressional Affairs' connection to electronic health records was already satisfied in response to part *one* of the Underwood request, which is the part of the Underwood request on which CBP previously won summary judgment. Dkt. 201 ¶ 11.

**RESPONSE**:

Disputed. The Court denied summary judgment as to parts 2 and 3 of Stevens's request, which are distinct from part 1. Dkt. 201.

37. Stevens proposed that CBP search the office of the Executive Director of Policy, but that office sits under the umbrella of the Office of the Commissioner, which CBP previously tasked in 2024 to search for responsive records. Dkt. 201 ¶ 12. Nevertheless, as a show of good faith CBP reached out to the Office of Policy and Planning to confirm whether the office is reasonably likely to have responsive records. *Id.* That office responded in February 2026 that it had no records regarding guidance or implementation of EHR systems. Ex. B (2026 Howard Decl.) ¶ 31.

**RESPONSE**:

Admitted.

38. Stevens proposed that CBP search the Office of the Intergovernmental Public Liaison, but that office sits under the umbrella of the Office of the Commissioner, which CBP previously tasked in 2024 to search for responsive records. Dkt. 201 ¶ 13. Nevertheless, as a show of good faith CBP reached out to the Office of Intergovernmental Public Liaison to confirm whether the office is likely to have responsive records. *Id.* That office responded in February 2026 that it

had no records regarding EHR systems or any communications about them. Ex. B (2026 Howard Decl.)

**RESPONSE**:

Disputed that the steps described in paragraph 38 are a "show of good faith," since CBP never provided any detail as to what type of outreach was conducted to the Office of Intergovernmental Public Liaison and what kind of search was done. Otherwise, admitted.

39. Stevens proposed that CBP search any sub-offices within the Office of Acquisition that were not previously searched, but the Office of Acquisition had previously provided CBP's FOIA office with a comprehensive list of custodians, consisting of employees who were directly involved in the electronic health records project. Dkt. 201 ¶ 14. The search of those custodians yielded millions of pages. *Id.*; *see also* Ex. B (2026 Howard Decl.) ¶ 33.

**RESPONSE**:

Disputed. See response to DSOF 25.

40. CBP reported on February 4 and 5, 2026, that it stood ready to apply additional search terms supplied by Stevens to the enormous universe of potentially responsive records. Dkt. 195 ¶ 9, 201 ¶ 15.

**RESPONSE**:

Disputed that the cited fact establishes that the universe of potentially responsive records is "enormous," since it does not establish whether CBP applied the limitations Stevens suggested.

**FOIA Request to HHS**

41. Stevens submitted a FOIA request to HHS in December 2019, seeking several categories of records relating to Congresswoman Lauren Underwood's time as an HHS employee: (1) position announcements for jobs Underwood had at HHS; (2) reports, memoranda, or analyses Underwood produced there; (3) travel itineraries; and (4) expense

reports. Ex. C (Dec. 2025 Lancey Decl.) ¶ 5. Stevens identified the time frame of the request as January 1, 2010, to January 22, 2017. *Id.*

**RESPONSE**: Admitted.

42. When Underwood was at HHS, she served as a Senior Advisor to the Assistant Secretary for Preparedness and Response, so HHS directed its search efforts to the current iteration of that office, which is now known as the Administration for Strategic Preparedness and Response. Ex. C (Dec. 2025 Lancey Decl.) at 2.

**RESPONSE**: Admitted that in November 2014 Ms. Underwood served as a Senior Advisor to the Assistant Secretary for Preparedness and Response. However, from 6/2010 to 11/2014, Ms. Underwood worked in the HHS Exec. Secretary office and held the position of "Office of the Secretary, Policy Coordinator." See ECF # 214 PAGE ID 1847; Supplemental Lancey Decl. para 479.

To accomplish that search, the Office of the Secretary's Office of the Chief Information Officer searched for every email Underwood sent between January 1, 2010, and January 22, 2017. Ex. C (Dec. 2025 Lancy Decl.) at 2-3. The search for Underwood's emails yielded 76,128 items, which were de-duplicated and reviewed for responsiveness. Ex. C (Dec. 2025 Lancey Decl.) at 3.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

43. After that de-duplication, HHS reviewed 18,804 pages of potentially responsive records and produced the responsive records over the course of more than 30 monthly productions. Ex. E

(Mar. 2026 Lancey Decl.) ¶ 33 (stating that HHS produced a total of 18,824 pages); *id.* ¶¶ 26-27 (clarifying that the final, 32nd production in March 2026 contained 20 pages).

**RESPONSE**: Disputed. The declaration states that of the 18,804 pages of potentially responsive records HHS released to Plaintiff only 1,281 pages. Defendant has provided no details or explanation for withholding 17,513 pages of potentially responsive records. See Mar. 2026 Lancey Decl.) ¶ 33 (*"Including this production, the Department has reviewed a total of 18,824 pages of records across 32 separate productions, of which 1,281 pages have been released to the plaintiff."*).

44. In addition, HHS liaised with personnel in the Administration for Strategic Preparedness and Response as well as the Assistant Secretary for Administration, Office of Human Resources to identify systems reasonably likely to contain responsive employment and travel-related records. Ex. E (Mar. 2026 Lancey Decl.) ¶ 8.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

45. To find employment records, HHS queried its official personnel and staffing systems that maintain records relating to federal employees' appointments, position classifications, and hiring documentation, using Underwood's name, position titles, and organizational affiliations. Ex. E (Mar. 2026 Lancey Decl.) ¶ 10.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

46. To find travel-related records, HHS queried, for records associated with Underwood during the relevant period, its travel-management systems used to authorize, book, and reimburse official government travel. Ex. E (Mar. 2026 Lancey Decl.) ¶ 11.

**RESPONSE**:

Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo. The Declaration does not identify the search terms used.

47. These searches yielded around 92 pages of responsive records, which HHS produced in its first two productions of records responsive to Stevens's FOIA request, in December 2022 and January 2023. Ex. E (Mar. 2026 Lancey Decl.) ¶ 12.

**RESPONSE**: Admitted.

48. HHS's initial search efforts were reasonably calculated to locate all records responsive to Stevens's request. Ex. D (Feb. 2026 Lancey Decl.) at 1-2.

**RESPONSE**: Disputed. See ECF # 214 at PAGE ID 1847-48; Supplemental Lancey Declaration detailing additional search and efforts after Plaintiff identified deficiencies in the original search.

49. From its monthly productions that began in 2022, HHS redacted certain material under one or more exemptions from disclosure under the FOIA statute. Ex. C (Dec. 2025 Lancey Decl.) at

**RESPONSE**: Admitted.

50. HHS initially redacted certain information under Exemption 5, which protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with an agency," 5 U.S.C. § 552(b)(5), but HHS subsequently withdrew its Exemption 5 withholdings and re-produced those pages with the Exemption 5 redactions lifted. Ex. E (Mar. 2026 Lancey Decl.) ¶ 5.

**RESPONSE**: Admitted.

51. The court set a specific schedule governing how Stevens was to present to HHS any issues she had with HHS's production. Dkt. 173. Under that schedule, Stevens needed to send HHS a letter outlining "her objections to HHS's search or withholdings" by January 2, 2026. *Id.*

**RESPONSE**: Admitted.

52. Stevens's January 2, 2026 letter contained no objections relating to HHS's Exemption 5 withholdings. Ex. F (Jan. 2, 2026 Stevens letter). And Stevens has acknowledged as much. Dkt. 199 (Joint Status Report) at 7 ("Stevens acknowledges that she did not identify concerning b(5) redactions by the court's deadline.").

**RESPONSE**: Admitted but irrelevant. The purpose of the process agreed by the parties was to eliminate the need for a Rule 56 motion. Now that Defendant has elected to file a motion for summary judgment is bears the burden imposed on it under FOIA to show that it has conducted an adequate search and has justified **all** of its withholdings.

53. The parties previously agreed that Stevens would not challenge HHS's "routine"

Exemption 6 withholdings. Dkt. 199 (Joint Status Report) at 8.

**RESPONSE**: Admitted.

54. Stevens has cited a redaction that she says is not "routine." *See* Ex. F (Jan 2, 2026 Stevens
letter) at 3. The challenged redaction appears on an email HHS produced that Underwood
sent on November 3, 2016, in which Underwood wrote, "I got promoted! I'm now the
Senior Advisor for Nicki in ASPR! Yay—," followed by a little over one line of redacted
text. Ex. G (Nov. 3, 2016 Underwood email (redacted)).

**RESPONSE**: Admitted.

55. The line of text that HHS redacted contains information about Underwood's
personal life. Ex. E (Mar. 2026 Lancey Decl.) ¶ 7.

**RESPONSE**: Admitted that Defendant's affiant makes the assertion; FOIA, however, does not
provide an exemption for "personal life". Plaintiff joins Defendant in requesting that the Court
review the challenged email in camera.

56. Following correspondence between counsel in late 2025 and early 2026, HHS undertook
additional searches to ensure that all locations reasonably likely to contain responsive
records had been adequately searched. Ex. E (Mar. 2026 Lancey Decl.) ¶ 13.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

57. As a part of this supplemental effort, HHS conducted additional outreach to the Office of the Assistant Secretary for Administration's Office of Human Resources to identify any records relating to position announcements associated with Underwood's positions at HHS. Ex. E (Mar. 2026 Lancey Decl.) ¶ 14.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

58. Personnel in the Office of Human Resources then searched the Department's Enterprise Human Capital Management system to confirm Underwood's employment history, including that she applied for an initial appointment in 2010 and for a merit promotion in 2014. Ex. E (Mar. 2026 Lancey Decl.) ¶ 15.

**RESPONSE**:

59. The Office of Human Resources responded that HHS transitioned to a newer version of "USA Staffing" around 2017-2018, that historical records were not migrated to that system, and that under Office of Personnel Management requirements, vacancy announcement records are retained for only three years, after which point they are deleted unless subject to a litigation hold. Ex. E (Mar. 2026 Lancey Decl.) ¶ 16.

**RESPONSE**:

60. HHS accordingly determined that position announcements responsive to Stevens's request are no longer maintained and do not exist within HHS's control. Ex. E (Mar. 2026 Lancey Decl.) ¶ 17.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

61. HHS also conducted additional outreach to its Immediate Office of the Secretary, Office of Business Operations, to determine whether records relating to Underwood's travel itineraries and related travel documentation from 2010 to 2014 could be located. Ex. E (Mar. 2026 Lancey Decl.) ¶ 18.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

62. The personnel in that office responded that, while records from that period would have originally been maintained within HHS's official travel and financial management systems, the office does not maintain access to travel documentation from that period due to system and program transitions, including HHS's transition from GovTrip to Concur Government Edition in 2015 and changes to the government travel card program. Ex. E (Mar. 2026 Lancey Decl.) ¶ 19.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

63. The office further explained that travel records—including itineraries, authorizations, and vouchers—are maintained in accordance with the National Archives and Records Administration General Records Schedule for travel records, which requires retention for six years and three months after payment. Ex. E Mar. 2026 Lancey Decl.) ¶ 20.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

64. HHS accordingly determined that the Immediate Office of the Secretary, Office of Business Operations would not reasonably be expected to have responsive records for the relevant time period. Ex. E (Mar. 2026 Lancey Decl.) ¶ 21.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

65. HHS also sought to identify records relating to Underwood's travel expense reports, vouchers, and related financial documentation, through the Immediate Office of the Secretary, Office of Business Operations and relevant financial and travel systems. Ex. E (Mar. 2026 Lancey Decl.) ¶ 22.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

66. The personnel in the Immediate Office of the Secretary, Office of Business Operations advised that records such as travel vouchers, local vouchers, expense reports, receipts, and government travel card transactions from the relevant period would have been maintained in HHS's official travel and financial systems and subject to the same retention schedules described above. Ex. E (Mar. 2026 Lancey Decl.) ¶ 23.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

67. The office further explained that receipts and supporting documentation are retained for only limited periods under applicable records schedules, and the requested time period significantly precedes those retention periods, so the records are no longer available. Ex. E (Mar. 2026 Lancey Decl.) ¶ 24.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

68. HHS accordingly determined that it does not have responsive expense report records for the relevant time period. Ex. E (Mar. 2026 Lancey Decl.) ¶ 25.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.

69. On March 13, 2026, HHS issued its thirty-second production in response to Stevens's FOIA request. Ex. E (Mar. 2026 Lancey Decl.) ¶ 26.

**RESPONSE**: Admitted.

70. In preparing to issue that production, HHS reviewed 20 pages of records that had previously been referred to other offices for consultation, which were more recently returned to HHS for final disposition. Ex. E (Mar. 2026 Lancey Decl.) ¶ 27.

**RESPONSE**: Admitted.

71. HHS redacted portions of the 20 pages under Exemptions 5 and 6.        Ex. E (Mar. 2026 Lancey Decl.) ¶ 29.

**RESPONSE**: Admitted.

72. The Exemption 5 redactions consist of pre-decisional and deliberative internal agency communications, including discussions regarding proposed revisions to the National Emergency Repatriation Plan, potential updates to interagency roles, and possible protocols and policy changes. Ex. E (Mar. 2026 Lancey Decl.) ¶ 30.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under

FOIA is a question of law to be determined by the Court de novo. Defendant has not presented a Vaugn index and does not provide sufficient details for the Court to determine that all redactions claimed fall within Exemption 5.

73. The Exemption 6 redactions consist of personal information, including personal cell phone numbers, the name of a potential candidate for a public health position, and other personal information such as personal health information. Ex. E (Mar. 2026 Lancey Decl.) ¶ 31.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo. Plaintiff does not challenge redactions for "personal cell phone numbers", the "name of a potential candidate for a public health position", and "personal health information". Plaintiff and the Court have no way to determine what else is "included" in the redactions or what the "other personal information" may be save for personal health information.

74. HHS has released all reasonably segregable, non-exempt portions of the referred records produced on March 13, 2026: it has conducted a careful review and has determined that all the withheld information is either exempt from disclosure under FOIA or is not reasonably segregable. Ex. E (Mar. 2026 Lancey Decl.) ¶ 32. Any non-exempt information is inextricably intertwined with exempt material such that segregation is not possible without revealing protected information. *Id.*

**RESPONSE**: Admitted.

75. Overall, HHS's supplemental search efforts were reasonably calculated to locate all records responsive to Stevens's request. Ex. E (Mar. 2026 Lancey Decl.) ¶ 34.

**RESPONSE**: Admitted that the Lancey Declaration so states; disputed as to whether these search efforts are proper and/or sufficient under the Act. Whether Defendant has met its obligation under FOIA is a question of law to be determined by the Court de novo.