**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JACQUELINE STEVENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:22 C 5072** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HEALTH AND HUMAN SERVICES, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Nearly four years ago, Jacqueline Stevens, a political science professor at Northwestern University, filed this lawsuit against several federal agencies to compel responses to her requests for agency records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The two remaining defendants—the Department of Health and Human Services (HHS) and Customs and Border Protection (CBP)—have filed motions for summary judgment on the adequacy of their searches for responsive documents. Stevens has filed a cross-motion for summary judgment against CBP, challenging the adequacy of its search and its justification for withholdings in its existing productions. For the reasons below, the Court denies both sides' motions but finds certain points in Stevens's favor pursuant to Fed. R. Civ. P. 56(g). Any remaining undecided issues will proceed to trial.

### Background

This case has a protracted and somewhat disjointed history, captured in part by the Court's opinions on previous rounds of dispositive motions. This background

section focuses on the facts relevant to the present motions.

## A.      Request to HHS

On December 11, 2019, Stevens submitted a FOIA request to HHS seeking "records tied to the hiring, transfers, and scope of work performed by Lauren Underwood at HHS.  Underwood is at present a member of Congress (D-IL)."  Compl. ¶ 20; *see* Pl.'s Resp. to Defs.' Stat. of Facts (DSOF) ¶ 41.[1]  Stevens requested four categories of records:

> 1) all position announcements associated with any jobs she held at HHS.
> 2) all reports, memorandums, or analyses she produced, including but not limited to her work on Ebola and other emergency public health matters.
> 3) all travel itineraries.
> 4) all expense reports.

Compl. ¶ 20; *see* Pl.'s Resp. to DSOF ¶ 41.  Stevens further specified, "The time frame of this request is Jan. 1, 2010 to January 22, 2017."  Compl. ¶ 20; *see* Pl.'s Resp. to DSOF ¶ 41.  She received an email confirming receipt of this request on January 13, 2020, but the 30-day FOIA deadline came and went without any additional response until she initiated this lawsuit on September 16, 2022.

Starting in December 2022, HHS began reviewing and producing documents in monthly interim responses.  The parties do not seem to specify exactly when this initial wave of interim responses ended, but HHS produced roughly thirty monthly responses, which would have been complete around July 2025.  *See* DSOF ¶ 43; Joint Status Report (JSR), May 9, 2025, dkt. 154 ¶ 5.  On December 18, 2025, HHS sent Stevens a declaration in which Brandon Lancey, a "Lead Government Information Specialist" in

---

[1] This case has gone through multiple rounds of summary judgment.  Citations to summary judgment materials relate to the present motions unless otherwise specified.

HHS's Office of the Secretary, described the agency's search up to that point. *See* JSR, Feb. 5, 2026, dkt. 199 at 2. In addition to more specific information, the declaration stated that HHS's search was "reasonably calculated to locate records responsive to the requester's submission." *Id.*, Ex. A at 13 of 27.[2]

On February 5, 2026, the parties filed a JSR describing a dispute over whether HHS's search was reasonably calculated to uncover *all* responsive records. The parties agreed that HHS would conduct a supplemental search for "position announcements" and "expense reports." *Id.* at 3–4. HHS completed its supplemental search and sent Stevens its thirty-second and final response on March 13, 2026.

On March 20, 2026, pursuant to a previously set briefing schedule, HHS moved for summary judgment on the adequacy of its search. In support of its motion, HHS has provided an updated version of Lancey's December 2025 declaration that Lancey signed on February 4, 2026 and that expressly states that HHS's search was "reasonably calculated to locate *all* records responsive to the requester's submission." DSOF, Ex. D (Lancey Initial Decl.) at 47 of 72. The Court refers to this updated version as Lancey's initial declaration. HHS later provided a supplemental declaration from Lancey, signed on March 19, 2026, that (1) provides additional detail about HHS's initial search for employment and travel records, and (2) describes HHS's supplemental search efforts.

**B.     CBP**

On November 22, 2019, Stevens submitted a FOIA request to DHS seeking

---

[2] Pincites for unpaginated exhibits use ECF pagination and follow the format "[pincite] of [total pages]."

three categories of documents.  Part one sought

> [a]ll communications and related materials created, received, or maintained by the Department of Homeland Security to which Rep. Lauren Underwood (D-IL) or any member of her staff were a party.  This includes but is not limited to all email, text messages, notes, reports, memorandums, proposed bill texts, and bill evaluations.

Pl.'s Opp'n to Mot. for Summ. J., Mar. 3, 2024, dkt. 77, Ex. E at 1 of 2.  For this part of the request, Stevens identified a specific statement by Underwood that she was interested in:

> In a floor speech of 9/26/2019 Rep. Underwood stated she received information from the "Department of Homeland Security" indicating a request for an integrated Electronic Health Records System she referenced as "EHR."  She refers to this in her remarks on HR 3525 as a "direct ask from medical officers at the Department of Homeland Security."  [Link to bill text in question.]  (It is possible that she actually had in mind Immigration and Customs Enforcement but failed to make this explicit.  In the event, I am requesting all communications associated with this "direct ask.")

*Id.*  Part two of Stevens's request asked for

> DHS communications and related materials created by or received from other components of DHS or the Department of Health and Human Services Office of Refugee Resettlement about the use of Electronic Health Records systems already in place as well as the establishment of an EHR for the use by offices of CBP.

*Id.*  Part three requested

> [i]nformation on meetings and communications with private individuals, including but not limited to lobbyists or company officials related to past, current, or potential "enterprise" or other information technologies for collecting, coordinating, or maintaining health records data for those encountered or detained by DHS or any component of DHS.

*Id.*  Regarding this third category, Stevens added, "I have in mind technical reports, email, text messages, or other communications with the private sector tied to past, current, or potential contracts tied to EHR systems."  *Id.*

On December 2, 2019, DHS transferred the request to CBP, a decision not at

4

issue in this case. CBP did not respond. On October 2, 2023, the Court granted Stevens's motion for summary judgment against CBP. Observing that CBP had "provide[d] no justification for this over three-year delay," the Court ordered CBP to "conduct a good-faith and reasonable search" in response to the request. *Stevens v. U.S. Dep't of Health & Hum. Servs.*, No. 22 C 5072, 2023 WL 6392407, at *7 (N.D. Ill. Oct. 2, 2023).

Three months later, in January 2024, CBP asserted that it had done so and moved for summary judgment. It provided a declaration from Patrick Howard, a "Branch Chief" in CBP's FOIA division, describing the agency's search. DSOF, Ex. A (Howard Initial Decl.) ¶1.[3] Stevens filed a cross-motion for summary judgment, challenging the adequacy of the search. On August 30, 2024, the Court granted summary judgment in CBP's favor on part one of Stevens's request but denied both parties' motions for summary judgment on parts two and three. *Stevens v. U.S. Dep't of Health & Hum. Servs.*, No. 22 C 5072, 2024 WL 4007684, at *11 (N.D. Ill. Aug. 30, 2024).

CBP had not conducted a search in response to part two because it believed that the request did not seek CBP records. The Court disagreed and ordered CBP to "promptly conduct a good-faith and reasonable search for records responsive to part two." *Id.* Regarding part three of the request, Howard's initial declaration suggested that CBP relied solely on the recollection of a single employee in CBP's Procurement Office to conclude that there were no responsive documents. *Id.* at *9. The declaration stated that "[a]ny work with outside persons or companies to develop the health records data described in the FOIA request would have to go through CBP's Procurement

---

[3] CBP relies on the same declaration in its present motion for summary judgment.

office[,] part of the CBP Office of Acquisition," and that the employee "serve[d] as the point of contact for electronic medical records within the Procurement Directorate." Howard Initial Decl. ¶¶ 26(c), 28.  The Court found that this was an inadequate explanation for CBP's decision to limit its search solely to that employee's memory and ordered CBP to "promptly conduct additional searches responsive to part three . . . including but not limited to the e-mail inbox of the previously identified Procurement Office employee."  *Stevens*, 2024 WL 4007684, at *11.

On September 27, 2024, CBP reported that it was reviewing the Procurement Office employee's emails and negotiating with Stevens over which other locations to search for responsive records.  CBP Status Report, Sep. 27, 2024, dkt. 105 ¶¶ 2–3.  By October 28, 2024, the parties had failed to reach an agreement on how CBP would conduct the rest of its search.  Pl.'s Resp. to DSOF ¶ 10.  CBP stated that it planned to search the following component offices:  (a) the Office of the Commissioner; (b) three enforcement offices—the Office of Field Operations, U.S. Border Patrol, and Air and Marine Operations; (c) a sub-office of Operations Support called the Office of the Chief Medical Officer—the location CBP thought was most likely to contain responsive records; and (d) Public Affairs.  *Id.*

In a November 20, 2024 JSR, CBP said that it had tasked those offices to search for responsive records.  JSR, Nov. 20, 2024, dkt. 115 ¶ 2.  Two offices had responded: Air and Marine Operations stated that it did not have any responsive records, and the Office of the Chief Medical Officer had identified and began searching seventeen custodians.  *Id.* ¶ 3.  CBP also disclosed that it had not tasked several other offices.  *Id.* ¶ 4.  Stevens objected to CBP's decision not to search three offices in particular:

"Enterprise Services, including but not limited to the Office of Information Technology[;] the Office of Chief Counsel . . . [;] and the Office of Congressional Affairs." *Id.* ¶ 15.

On February 13, 2025, the parties filed a JSR in which CBP reported that its taskings had returned 492,147 documents comprising 1.3 million pages. JSR, Feb. 13, 2025, dkt. 140 ¶ 2. CBP stated that it had employed the following search terms: "E.H.R."; "E.M.R."; "Electronic Health Record"; "Electronic Medical Record"; "EHR"; and "EMR." *Id.* ¶ 4. CBP had invited Stevens to propose additional search terms to narrow the universe of records to be reviewed, but she refused. *Id.* ¶ 6; *see* Pl.'s Resp. to DSOF ¶ 18. In her view, she could not "meaningfully narrow her request" because CBP would not provide more information about its search methodology—specifically, what types of databases and files were generating potentially responsive documents. JSR, Feb. 13, 2025, dkt. 140 ¶ 9.

On March 13, 2025, CBP stated that it had underestimated the universe of records because it had not finished running returned records through its FOIA software. CBP Status Report, Mar. 13, 2025, dkt. 147 ¶ 2. By CBP's updated count, the total number of pages from its searches was in the tens of millions. *Id.* The Office of Acquisition alone returned 26,012 documents totaling 2,335,351 pages. *Id.* By this point, the search for documents responsive to parts two and three of Stevens's request had "effectively merged." Pl.'s Resp. to DSOF ¶ 24.

Stevens's primary interest was in communications between CBP and outside contractors such as General Dynamics, so CBP proposed limiting the universe to the Office of Acquisition documents under 100 pages and applying the search term "General Dynamics," which yielded 230 documents comprising 5,766 pages. *Id.* ¶ 27;

7

CBP Status Report, Mar. 13, 2025, dkt. 147 ¶ 4.  CBP offered to process that "more reasonable number" of pages and invited Stevens to propose additional or different search terms "[i]f [she] would prefer CBP not to process the 'General Dynamics' pages." CBP Status Report, Mar. 13, 2025, dkt. 147 ¶¶ 5–6.  Stevens agreed that CBP should process the 5,766 pages but stated that she "reserve[d] the right to propose additional search terms and/or request further search(es) . . . should the processing of the 5,766 pages result in limited or no production at all."  Pl.'s Resp. to CBP Status Report, Mar. 21, 2025, dkt. 149 ¶ 4.  The Court ordered CBP to process the proposed documents at a rate of 750 pages a month.

On January 12, 2026, CBP reported that it had completed its review, with the exception of some unwieldy Excel files.  JSR, Jan. 12, 2026, dkt. 189, CBP's Summ. ¶ 5.  Stevens, however, asserted that CBP had produced "hundreds to thousands of pages that had nothing to do with Electronic Health Records."  *Id.*, Stevens's Summ. ¶ 4.  She requested additional information about how CBP generated the 5,766 pages— specifically, which systems it searched and how it determined those systems were the most likely to store relevant documents.  *Id.* ¶ 5.  CBP stated that this request from Stevens had come too close to the JSR filing deadline to produce a response.  *Id.*, CBP's Summ. ¶ 5.

The parties also submitted competing proposals for next steps.  CBP proposed the following process:  (1) Stevens would offer additional search terms to be applied to the universe of under-100-page documents from the Office of Acquisition, (2) CBP would apply the search terms to determine the number of potentially responsive records, (3) the parties would negotiate which terms to use, (4) CBP would process

those records, and (5) the parties would present any remaining issues to the Court.  *Id.*, Parties' Competing Proposals ¶ 7.  Stevens's alternative proposal was that CBP would locate a person with "subject matter expertise on CBP technology contracts," search all locations identified by that person as likely to have responsive records, and indicate in its filings which locations were searched and why.  *Id.* ¶ 8.  As for search terms, Stevens wanted CBP to generate and apply its own search terms "designed to locate records reflecting negotiations and lobbying regarding the establishment of an EHR for CBP."  *Id.*  Stevens specifically requested the following search terms:  "General Dynamics," "GD," "GDIT," "Underwood," members of Underwood's staff on the House Committee of Homeland Security, and any other contractors or lobbyists identified by the subject matter expert as likely to be involved in negotiations for the EHR database.  *Id.*  Stevens also stated that she had agreed to narrow the time period for her request to records created prior to January 1, 2020.  *Id.*

At a January 28 status hearing, Stevens proposed that CBP apply fifteen search terms (which appear to be email addresses of potential contractors) to (1) the existing universe of under-100-page documents from the Office of Acquisition, and (2) several additional locations:  (a) the Office of the Assistant Commissioner of Congressional Affairs; (b) the Office of the Executive Director of Policy; (c) the Office of the Intergovernmental Public Liaison; and (d) any sub-offices within the Office of Acquisition that were not previously searched.  Pl.'s Resp. to DSOF ¶¶ 32–33.

On February 5, the parties filed a JSR that largely captures the present state of affairs.  JSR, Feb. 5, 2026, dkt. 201 (2/5/26 JSR).  CBP reported that it had applied the fifteen search terms to the entire universe of pages that was returned from its taskings

following the 2024 summary judgment ruling. *Id.* ¶ 6. According to CBP, this yielded only ninety-eight documents that had not yet been produced, *id.*, which CBP later produced on March 20, 2026, Pl.'s Resp. to DSOF ¶ 34. CBP did not apply the search terms to the additional locations Stevens proposed, providing reasons that it continues to rely upon, which the Court analyzes below. *See* 2/5/26 JSR ¶¶ 5–8; DSOF ¶¶ 36–39. CBP did, however, reach out to the Office of Policy and Planning and the Office of the Intergovernmental Public Liaison—both of which sit under the Office of the Commissioner. Both offices responded that same month and stated that they were not likely to have responsive records.

CBP stated that it was willing to apply additional search terms to the total universe of records. Stevens instead proposed that CBP apply the search terms she had previously identified (with minor alterations discussed below) to (1) a narrowed version of the existing universe "only documents of 100 pages or fewer and only the timeframe 2019," and (2) the additional offices she had previously requested. 2/5/26 JSR ¶ 24. Stevens also asserted that she had received a set of records via a different FOIA case showing a $30 million congressional appropriation for a CBP EHR system. *Id.* ¶ 18.

On February 12, 2026, Stevens's counsel emailed CBP's counsel with five points. Pl.'s App'x Mot. for Summ. J., Ex. 2-A. First, she requested a description of how CBP was conducting its promised outreach to the Office of Policy and Planning and Office of the Intergovernmental Public Liaison, including whom CBP was consulting and what records systems were being searched. Second, she argued that the $30 million congressional appropriation documents showed that CBP should search the Office of

10

Congressional Affairs.  Third, she asked which sub-offices and record systems CBP searched in the Office of Acquisitions.  Fourth, she requested a count of "how many pages of potentially responsive records exist given the following two limitations which I do not believe CBP applied to its previous search:  a) 2019 only, and b) 'communications under 100 pages.'"  *Id.*  Fifth, Stevens reiterated that she sought records from the Office of Chief Counsel and asked for an update on CBP's position regarding that request.  CBP did not provide a substantive response.  *See* Defs.' Resp. to Pl.'s Stat. of Facts (PSOF) ¶ 14.

On March 20, pursuant to the Court's briefing schedule, CBP moved for summary judgment on the adequacy of its search.  As evidentiary support, CBP has produced a supplemental declaration from Howard.  DSOF, Ex. B (Howard Suppl. Decl.).  CBP has not moved for summary judgment on the propriety of its withholdings or redactions in the materials produced so far, citing the need for more time to produce a *Vaugn* index.  In addition to resisting CBP's motion, Stevens has moved for summary judgment against CBP on the inadequacy of its search and withholdings.

### Discussion

FOIA's fundamental purpose is to provide public access to government documents, "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d 381, 386 (7th Cir. 2015) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  "Toward that end, FOIA provides that agencies 'shall make . . . records promptly available to any person' who submits a request that '(i) reasonably describes such

records and (ii) is made in accordance with [the agency's] published rules,'" subject to enumerated exceptions. *Id.* (quoting 5 U.S.C. § 552(a)(3)(A)). The Act is interpreted in favor of disclosure. *Id.*

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, a plaintiff challenges the adequacy of an agency's search for records, the agency may meet its burden by showing "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Rubman*, 800 F.3d at 387 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

As evidence, the agency may rely on a "reasonably detailed nonconclusory affidavit[]." *Id.* (quoting *In re Wade*, 969 F.2d 241, 249 n.11 (7th Cir. 1992)). The affidavit must set forth enough information "to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *Id.* (quoting *Oglesby*, 920 F.2d at 68). That usually entails "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (quoting *Oglesby*, 920 F.2d at 68). An affidavit that meets these criteria is entitled to a presumption of good faith. *White v. U.S. Dep't of Just.*, 16 F.4th 539, 544 (7th Cir. 2021); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

The FOIA requester can rebut the affidavit with "countervailing evidence as to the adequacy of the agency's search." *Rubman*, 800 F.3d at 387 (quoting *Iturralde v.*

12

*Comptroller of the Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003)) (internal quotation marks omitted).  "Once both parties have made their case, 'if a review of the record raises substantial doubt [about the adequacy of the search], . . . summary judgment [in the agency's favor] is inappropriate."  *Id.* (quoting *Iturralde*, 315 F.3d at 314) (internal quotation marks omitted).  The question is only "whether the search was performed reasonably and in good faith," not "whether the agency *might* have additional, unidentified responsive documents in its possession."  *Id.*

## A.     HHS

HHS relies on Lancey's initial and supplemental declarations to establish that it has conducted an adequate search.  Lancey's initial declaration provides the following information, in the following order.

First, Lancey attests that HHS "directed its search efforts" to what is now known as the Administration for Strategic Preparedness and Response (ASPR) because that is "the office in which [Underwood] worked during the relevant period."  Lancey Initial Decl. at 47 of 72.

Second, Lancey says that "[i]n addition to conducting a search for this request, HHS also identified records that had been previously located in response to a substantially similar request submitted to [HHS]."  *Id.*  That request, which is not at issue in this case, sought the following documents:

> (1) a comprehensive job description for the position(s) held by Ms. Underwood, including clarification of her direct supervisor; (2) all employment records, including her résumé, dates of hire, promotion and leave, all job titles held, and the circumstances of her departure; (3) Ms. Underwood's personnel file, including any disciplinary actions, complaints filed by or against her, and employer performance reviews; (4) all available compensation records, including salary information, pay grade, salary adjustments, and any other benefits; (5) all expenses reimbursed to Ms.

> Underwood by the federal government; (6) all federally funded travel records and corresponding receipts; (7) all financial disclosure forms, conflict-of-interest disclosures or recusals, and ethics disclosures or recusals filed during her tenure at HHS; and (8) all gift or travel disclosures filed during her tenure.

*Id.* According to Lancey, "HHS located these records in electronic form as part of its response to that prior request." *Id.*

Third, Lancey states that "[t]o identify records responsive to both the prior request and the instant request, HHS searched the Department's Human Resources and Travel systems." *Id.*

Fourth, Lancey says, "for purposes of identifying records responsive to the instant request, the Office of the Chief Information Officer" (OCIO), a sub-office within the Office of the Secretary, "conducted a search of Ms. Underwood's HHS email account." *Id.* at 47–48 of 72. "OCIO searched for all emails, including attachments, that [Underwood] sent or received between January 1, 2010, and January 22, 2017." *Id.* at 48 of 72. This search yielded 76,128 items, which were processed, deduplicated, and reviewed on a rolling basis for responsiveness and withholdings, a process that occurred over the course of HHS's thirty interim responses.

Lancey's supplemental declaration provides more detail regarding the third point—HHS's initial search of the Department's Human Resources and Travel systems for employment and travel records:

> 9. [HHS] coordinated with appropriate personnel within [ASPR] and the Assistant Secretary for Administration, Office of Human Resources to identify systems reasonably likely to contain responsive employment and travel-related records.

> 10. For Human Resources records, HHS searched [its] official personnel and staffing systems that maintain records relating to federal employees' appointments, position classifications, and hiring documentation. These

14

systems were queried using identifiers associated with Ms. Underwood, including her name, position titles, and organizational affiliations.

11.  For travel-related records, HHS searched [its] travel management systems used to authorize, book, and reimburse official government travel. These systems were queried for records associated with Ms. Underwood during the relevant time period.

12.  As a result of this search, HHS located approximately 92 pages of responsive records from the period during which Ms. Underwood was employed at ASPR.  These records were produced in [HHS's] first and second interim responses, issued on December 20, 2022, and January 20, 2023, respectively.

*Id.* ¶¶ 9–12.

Lancey's supplemental declaration also describes HHS's supplemental search efforts for employment and travel records in February 2026.  It contains the following information regarding HHS's supplemental searches for position announcements:

14.  HHS conducted additional targeted outreach to the Office of Human Resources ("OHR") . . . to identify any records relating to position announcements associated with Ms. Underwood's positions.

15.  OHR personnel searched [HHS's] Enterprise Human Capital Management ("EHCM") system and confirmed Ms. Underwood's employment history, including that she applied for an initial employment in 2010 and for a merit promotion in 2014.

16.  OHR further advised that historical vacancy announcements are not maintained beyond applicable retention periods.  [HHS] transitioned to a newer version of USA Staffing in or around 2017–2018, and historical records were not migrated to that system.  Additionally, pursuant to Office of Personnel Management requirements, vacancy announcement records are retained for only three years, after which they are deleted unless subject to a litigation hold.

17.  Based on this information, HHS determined that position announcements responsive to [Stevens's] request are no longer maintained and do not exist within [HHS's] control.

*Id.* ¶¶ 14–17.  The declaration describes a similar search for travel records:

18.  HHS conducted additional outreach to the Immediate Office of the

Secretary ("IOS"), Office of Business Operations ("OBO"), to determine whether records relating to Ms. Underwood's travel itineraries and related travel documentation from the period 2010 through 2014 could be located.

19. IOS / OBO personnel advised that, while such records would have originally been maintained within the Department's official travel and financial management systems, IOS does not maintain access to travel documentation from that period due to subsequent system and program transitions, including [HHS's] transition from GovTrip to Concur Government Edition in 2015 and changes to the government travel card program.

20. IOS further explained that travel records, including itineraries, authorizations, and vouchers, are maintained in accordance with the National Archives and Records Administration General Records Schedule for travel records, which requires retention for six years and three months after payment. Because the timeframe at issue predates that retention period, such records are no longer maintained.

21. Based on this information, HHS determined that IOS / OBO would not reasonably be expected to maintain responsive travel itinerary records for the relevant time period.

22. HHS also sought to identify records relating to Ms. Underwood's travel expense reports, vouchers, and related financial documentation through IOS/OBO and relevant financial and travel systems.

23. IOS / OBO personnel advised that records such as travel vouchers, local vouchers, expense reports, receipts, and government travel card transactions from the relevant period would have been maintained within the Department's official travel and financial systems and subject to the same retention schedules described above.

24. IOS further explained that receipts and supporting documentation are retained only for limited periods under applicable records schedules. Because the requested timeframe significantly predates those retention periods, such records are no longer available.

25. Accordingly, HHS determined that it does not maintain responsive expense report records for the relevant time period and that further searches would not be reasonably likely to locate such records.

*Id.* ¶¶ 18–25.

## 1. Position announcements

Category one of Stevens's request to HHS seeks "all position announcements

associated with any jobs [Underwood] held at HHS." Lancey Initial Decl. ¶ 5. The Court starts with HHS's supplemental outreach to OHR, in which OHR (1) confirmed Underwood's employment history through a search of HHS's EHCM system, and (2) advised HHS that (a) it transitioned to a new version of USA Staffing in 2017–18 and did not retain historical records, and (b) vacancy announcement records are retained for only three years. Stevens challenges the search of the EHCM system, but it is not clear why that search would be inadequate. As the Court understands HHS's declarations and briefs, the EHCM search was merely a preliminary step to confirm Underwood's employment history, and Stevens does not seem to dispute that it correctly identified that Underwood applied for positions in 2010 and 2014. And according to OHR, position announcements from those dates would not be retained because of the USA Staffing transition and the three-year retention policy for vacancy announcement records.

That is a reasonable explanation, but only a partial one. HHS conducted an initial search for position announcements and travel documents in 2022 and 2023. By that time, the retention deadlines that HHS points to now would have already passed. Yet that initial search yielded ninety-two pages of responsive records, some of which may have been position announcements that survived the retention policies. If so, HHS must show that it has conducted an adequate search for all preserved position announcements.

On that front, HHS's declarations lack sufficient detail. Lancey's initial declaration provided a plainly inadequate description of the agency's initial search, stating only that "HHS searched [its] Human Resources and Travel systems." *Id.* at 47

17

of 72. The supplemental declaration offers more information. First, HHS coordinated with ASPR and OHR "to identify systems reasonably likely to contain responsive employment . . . records." Lancey Suppl. Decl. ¶ 9. Then, "[f]or Human Resources records, HHS searched the Department's official personnel and staffing systems that maintain records relating to federal employees' appointments, position classifications, and hiring documentation. These systems were queried using identifiers associated with Ms. Underwood, including her name, position titles, and organizational affiliations." *Id.* ¶ 10.

This is an improvement over the initial declaration, but it still leaves open genuine disputes of material fact. Lancey's supplemental declaration describes what systems HHS searched and what kinds of search terms it used, but only vaguely. The declaration states that HHS searched its "official personnel and staffing systems that maintain records relating to federal employees' appointments, position classifications, and hiring documentation." But that description, without more, is difficult to distinguish from a "generalized assertion that [HHS] examined the appropriate subject files," which is insufficient to carry the agency's burden. *See Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986). Put differently, the sparse description provides little opportunity for Stevens to challenge, and for the Court to assess, HHS's decisions on where to search and where not to. It does not, for example, "describe at least generally the structure of the agency's file system," which would enable an evaluation of whether HHS's decision not to search other locations was reasonable. *Id.* The only additional information in the declaration is that HHS coordinated with ASPR and OHR to identify "systems reasonably likely to contain responsive records," but the lack of any detail

18

about what that consultation looked like precludes meaningful review.

The parties' briefing reflects these problems. Stevens argues that the systems HHS searched "may contain SF-50s and other appointment paperwork, but . . . not necessarily . . . the position announcements themselves—the vacancy announcements that describe the job, qualifications, and duties for the positions Underwood held or applied for." Pl.'s Resp. to HHS at 4. Stevens contends that "[p]osition announcements are distinct HR documents, often maintained in separate recruiting or vacancy-posting databases, USAJOBS archives, or HHS-specific HR files." *Id.* Stevens also suggests that HHS should have searched "ASPR-specific recruiting files, email attachments, shared drives, or even backup tapes." *Id.* at 6. HHS has not replied that those are encompassed within or duplicative of the "official personnel and staffing systems" that it searched, as one might expect if it were the case. Instead, HHS's only reply is that Stevens has not provided citations to support her assertion that those locations are likely to contain responsive records. But that is understandable if she, like the Court, lacks any information about HHS's record-keeping structure. And Stevens's proposed locations, if they exist, intuitively seem like places reasonably likely to contain position announcements.

HHS's description of its search terms is also missing key contextual information. A search for Underwood's "name, position titles, and organizational affiliations" might be adequate for one searched system but inadequate for another. If the system allowed HHS to input its own search terms, then the adequacy of the search might turn on the exact language that HHS used. For example, a search that used terms such as "'Lauren Underwood' AND 'Senior Advisor'" but neglected to try just "Underwood" might

be unreasonably narrow. HHS's description of its search terms would not be specific enough to determine the adequacy of its search. In contrast, consider a system that sifts through categories of documents via a preset list of search qualifiers. In that situation, if "Lauren Underwood" is the only preset qualifier, then it might be more likely to turn up all records relevant to Underwood, whether the record says "Lauren Underwood" or just "Lauren" or just "Underwood." HHS's general description of its search terms, without some context about how those search terms were applied, is too vague to determine whether its search was reasonably calculated to uncover all relevant records.

Finally, the Lancey declarations' reference to a prior request not at issue in this case create further doubts about the adequacy of HHS's search in response to Stevens's current request. The prior request sought several categories of employment records related to Underwood: "job description[s]"; "all employment records, including her resume, dates of hire, promotion and leave, all job titles held, and the circumstances of her departure"; and her "personnel file, including any disciplinary actions, complaints filed by or against her, and employer performance reviews." Lancey Initial Decl. ¶ 5. It is not clear from Lancey's declarations whether HHS conducted a separate search in response to the request at issue in the present case or instead relied, in part or entirely, upon its search efforts in response to Stevens's prior request. Indeed, Lancey's supplemental declaration might reasonably be read to describe a search responsive to the prior request rather than Stevens's current request. It describes a search for "Human Resources records"; "records relating to federal employees' appointments, position classifications, and hiring documentation"; and Underwood's "name, position

20

titles, and organizational affiliations."  Lancey Suppl. Decl. ¶¶ 10–11.  The declaration only uses the term "position announcements" once it shifts to describing the supplemental search efforts that led to the retention problem.  *See id.* ¶ 14.

To the extent that HHS relied on its previous search efforts, it is required to justify that decision.  To be sure, there are obvious similarities between the prior request and Stevens's current request for position announcements.  But the two are not identical or duplicative on their face.  If HHS believes that its previous search was also reasonably calculated to uncover all relevant position announcements, it must provide some explanation for why.

The Court therefore denies HHS's motion for summary judgment regarding Stevens's request for "all position announcements associated with any jobs [Underwood] held at HHS."  HHS's declarations leave open genuine disputes regarding (1) the scope of the retention problems HHS encountered in its supplemental search and whether any responsive documents might still exist, and (2) whether HHS conducted an adequate search for any preserved documents in its initial search.  On the second issue, there are genuine disputes regarding (a) whether HHS tailored its search to Stevens's current request or her prior request; (b) HHS's basis for selecting its search locations and whether they encompass all locations reasonably likely to contain responsive records; and (c) how HHS employed its search terms and, if material, what exact search terms it used.

### 2.     Work product

Category two of Stevens's request to HHS seeks "all reports, memorandums, or analyses [Underwood] produced, including but not limited to her work on Ebola and

other emergency public health matters." Lancey Initial Decl. ¶ 5. In response to this request, HHS searched "all emails, including attachments, that [Underwood] sent or received between January 1, 2010, and January 22, 2017." *Id.* at 48 of 72. Stevens argues that HHS has not provided a "basis for concluding that reports and analyses produced by Underwood were only transmitted via email[]." Pl.'s Resp. to HHS at 3. She also provides a list of alternative locations: "shared network drives or folders"; "document management systems or repositories where policy, preparedness, or analytical work product is routinely stored"; and "local hard drives or archived files associated with Underwood's workstation." *Id.* HHS replies that "email is the standard method for sharing reports, memoranda, and analyses in the working world." Defs.' Reply at 10.

Perhaps, but an agency's duty under FOIA is to search every location likely to house responsive documents, not only the locations "most likely" to. *See Viola v. U.S. DOJ*, 157 F.4th 524, 536 (3d Cir. 2025) (citing *Oglesby*, 920 F.2d at 68). The ubiquity of email goes a long way to establishing that it is the most likely place to search, but it does not lead to the conclusion that no other locations were likely to produce responsive documents. HHS has not provided a basis for that conclusion.

Moreover, HHS misreads the scope of this request. Stevens requested "all reports, memorandums, or analyses [Underwood] *produced*," not only those that Underwood shared with others. Even if email were the sole method of sharing work-product, a search of only Underwood's email could be unduly narrow if she produced "reports, memorandums, or analyses" that were never shared with others. Viewed properly, Stevens's argument that HHS should have searched drives, folders, and hard

22

drives is fair game.  At the very least, HHS is required to explain its basis for limiting its search to Underwood's emails.  Its declarations do not sufficiently do so.

The Court therefore denies HHS's motion for summary judgment regarding Stevens's request for "all reports, memorandums, or analyses [Underwood] produced."

### 3.    Travel documents

Categories three and four of Stevens's request to HHS seek "all travel itineraries" and "all expense reports."  The parties treat these as a single category, so the Court does as well.  HHS's description of its search efforts in response to this request is similar to its description regarding position announcements.  HHS conducted an initial search in 2022 and 2023, yielding ninety-two documents responsive to either the position-announcements request or this one.  Lancey's supplemental declaration provides a two-sentence description:  "HHS searched the Department's travel management systems used to authorize, book, and reimburse official government travel.  These systems were queried for records associated with Ms. Underwood during the relevant time period."  Lancey Suppl. Decl. ¶ 11.  In 2025–26, HHS conducted "additional outreach" to IOS / OBO to find travel documents from 2010–2014.  IOS / OBO advised HHS that it did not retain records from that period due to "system and program transitions, including the Department's transition from GovTrip to Concur Government Edition in 2015."  *Id.* ¶ 19.  Additionally, IOS / OBO advised HHS that under the National Archives and Records Administration General Records Schedule, travel records are retained for only six years and three months after payment.

As with the position announcements, this description leaves open genuine disputes of material fact.  First, the production in 2022 and 2023 suggests that some

documents survived the retention policy.  If so, the question is whether HHS conducted an adequate search for those documents in its initial search.  The Lancey declarations provide no more detail regarding HHS's initial search for travel documents than they do regarding the search for position announcements.  In fact, they provide less.  For position announcements, Lancey's supplemental declaration states that HHS "queried [systems] using identifiers associated with Ms. Underwood, including her name, position titles, and organizational affiliations."  *Id.* ¶ 10.  For travel documents, Lancey's supplemental declaration does not discuss search terms at all, stating only that HHS "queried [systems] for records associated with Ms. Underwood during the relevant time period."  *Id.* ¶ 11.

That might not be a problem if HHS made a reasonable decision not to use search terms—for example, if somebody manually went through the system to identify records "associated with Ms. Underwood."  But HHS does not say that, despite Stevens raising the discrepancy in her response brief.  Instead, HHS's only reply is that Stevens violated Local Rule 56.1(g) by citing directly to one of its exhibits.  That does not change the fact that HHS has not sufficiently demonstrated the adequacy of its search—a burden it bears in seeking summary judgment.

The Court therefore denies HHS's motion for summary judgment regarding Stevens's request for "all travel itineraries" and "all travel reports."  As with Stevens's request for position announcements, HHS's declarations leave open genuine disputes regarding (1) the scope of the retention problems HHS encountered in its supplemental search and whether any responsive documents might still exist, and (2) whether HHS conducted an adequate search for any preserved documents in its initial search.  On the

24

second issue, there are genuine disputes regarding (a) whether HHS tailored its search to Stevens's current request or her prior request; (b) HHS's basis for selecting its search locations and whether they encompass all locations reasonably likely to contain responsive records; and (c) HHS's search methodology, including whether it applied search terms and, if so, which terms it used.

**B.      CBP**

CBP relies on Howard's initial and supplemental declarations to establish the adequacy of its search in response to parts two and three of Stevens's requests to CBP. The parties agree that those requests have effectively merged at this point, and it can be summarized as a request for documents related to an electronic health records system for DHS.

CBP's search efforts do not meet the usual standard for summary judgment under FOIA. Thus far, CBP has tasked multiple offices with searching for several terms related to electronic medical records; identified a universe of tens of millions of potentially responsive documents; and applied one search term, "General Dynamics," to the documents from only one office, for a review of 5,766 documents out of millions. There is no doubt that CBP might have other responsive documents.

Instead, CBP's core argument in support of its motion for summary judgment is that the identified universe would be unduly burdensome to process. The Court agrees that FOIA does not require CBP to review millions of documents, but Stevens proposed a narrowing solution in the 2/5/26 JSR. That proposal includes specific search terms, a limitation to documents under 100-pages, a time frame limited to the year 2019 only, and specific additional search locations. CBP has not yet attempted to apply that

25

narrowed search, which might yield a manageable universe of documents responsive to Stevens's request.

CBP contends that Stevens has engaged in a "shifting-sands" approach that an agency "cannot reasonably be expected to respond to." Defs.' Reply at 3. CBP has a point. Consider, as one example, the time limitation: Stevens argues in her reply brief that "[a] 2019 cutoff date was implicit in the original request," Pl.'s Reply at 3, but that is at odds with the fact that Stevens *only this year* "agreed to narrow the time period for the request to records created prior to January 1, 2020." JSR, Jan. 12, 2026, dkt. 189 ¶ 8. Similarly, although Stevens has stated in her summary judgment briefs that she seeks documents produced from 2017 through 2019, *see* Pl.'s Resp. to CBP at 6; Pl.'s Reply at 4 n.1, that is not a natural reading of her proposal in the 2/5/26 JSR, which suggests a search limited to "only the timeframe 2019." *See* 2/5/26 JSR ¶ 24(b). Regardless of her intent, Stevens's apparent inability to pin down a single, narrower search that CBP can carry out and be done with imposes an unnecessary burden on the agency.

At the same time, it is not fair to characterize all of Stevens's conduct as pure gamesmanship. From the start of the parties' dispute over how to narrow the universe of potentially responsive documents, Stevens has requested additional information about how CBP keeps its records and how it produced the existing universe of documents, stating that some additional information is necessary for her to meaningfully narrow the request. That is not unreasonable. CBP made the decision to task the offices that it did, with the search terms that it did. And although Howard's declarations say that much, they provide no information about how those offices' records are

26

organized, how the search terms were applied to those records, or a breakdown of how many potentially responsive documents came from which office or system. CBP points out that Stevens's February 2026 proposal came late in the case—a year after CBP initially reported that its taskings returned millions of pages—but much of that delay is not fairly attributed to her. That year-long delay was largely taken up by CBP processing documents for the search term "General Dynamics," a proposal that CBP itself made.

In the Court's view, the history of this case does not justify granting summary judgment to CBP and permitting it to disregard Stevens's proposal in the 2/5/26 JSR. In accordance with that proposal, CBP should narrow the current universe of documents to only those documents 100 pages or fewer and from the year 2019 only. Within that universe, CBP should apply the following sets of search terms:

(i) "@generaldynamics.com"; "@gdit.com"; "@ervingraves.com"; "@cgagroup.com"; "@acgadvocacy.com"; "@harbingerdc.com"; "@pennavenue.com"; "@potadv.com"; "@teamsubjectmatter.com"; "@vsadc.com"; "@federalstrategies.com"; "@nelsonmullins.com"; "@meltsnerstrategies.com"; "@align-strategies.com"; "@bakerdonelson.com"

(ii) "'EMR OR EHR' AND 'General Dynamics'"; "GD"; "GDIT"; "3525"

(iii) "Underwood"; members of her staff on the House Committee on Homeland Security (*last names only*)

Whether CBP should apply the same 100-pages-or-less limitation, 2019 only limitation, and search terms to additional locations will be determined at trial, as discussed in

27

further detail below.  Additionally, CBP should also provide enough information about its methodology to facilitate meaningful review.  That would ideally include, if feasible, a breakdown of which locations and search terms yielded what number of potentially responsive documents.  The Court grants Stevens's motion to this extent.  *See* Fed. R. Civ. P. 56(g).  Any disputes regarding whether the narrowed search would still be unduly burdensome to process, as CBP appears to contend, are matters for trial.

Turning to the details of Stevens's proposal, a few points require further discussion.  First, there is some confusion about whether the time frame is 2017–19 or 2019 only.  Given the history of this case and the number of documents that must be narrowed, the Court will hold Stevens to the language of the 2/5/26 JSR, which suggests a timeframe of 2019 only.

Second, the parties dispute whether CBP should engage a subject matter expert to help define the search, and that is reflected in Stevens's proposal in the 2/5/26 JSR that CBP apply search terms based on "any other contractors or their lobbyists identified by a subject matter expert as likely to be involved in negotiations for the EHR database."  2/5/26 JSR ¶ 24(b)(iii).  Stevens argues that CBP agreed to do so in a settlement conference, but using CBP's settlement negotiations to lock in the terms of its search obligations under FOIA would seem to run afoul of Federal Rule of Evidence 408.  The Court therefore has removed that search term.

Third, Stevens proposed that CBP search for "members of [Underwood's] staff on the House Committee on Homeland Security" but did not specify what precise search terms CBP should employ, if search terms are required.  The parties are directed to meet and confer within the next seven days and come up with a proposed

28

set of search terms along these lines for the Court's approval (i.e., a list of last names or first and last names), with a joint status report containing the proposal to be filed within fourteen days of today's date.  .

Fourth, some of Stevens's requested search terms appear to be redundant. Stevens requests a search for "EMR OR EHR *AND* 'General Dynamics,'" but CBP already applied the term "General Dynamics" to the documents under 100 pages from the Office of Acquisition (which included documents responsive to "EMR" and "EHR"). Likewise, CBP already applied the fifteen email search terms that Stevens proposes to the entire existing universe of documents.  CBP need not reapply these search terms to the same sets of documents.

Fifth and finally, the parties dispute whether and to what extent several offices still need to be searched.  Stevens's proposal requests a search of:  (1) the Office of Congressional Affairs; (2) the Office of the Commissioner, including three specific suboffices—the Office of the Executive Director of Policy, the Office of Policy and Planning, and the Office of the Intergovernmental Public Liaison; and (3) any sub-offices of the Office of Acquisition not previously searched.  The parties additionally dispute whether CBP should have searched the Office of International Affairs and the Office of Information and Technology.  The Court considers each in turn.

### 1.    The Office of Congressional Affairs

CBP argues that it need not search the Office of Congressional Affairs because it searched that office in response to part one of Stevens's request to CBP, on which the Court granted summary judgment in CBP's favor.  That part sought communications to which Underwood or any member of her staff were a party.  Stevens responds that

29

CBP's search for records responsive to part one does not satisfy its obligations regarding parts two and three—the requests relating to electronic medical records. Stevens has also produced documents obtained via another FOIA case that reflect a congressional appropriation of $30 million for a "Health Record System" for CBP. *See* Pl.'s App'x Mot. for Summ. J., Ex. 2-B. And she points out that the Office of Congressional Affairs's website states that it "serves as the single point of contact within CBP for all communications between CBP and Congress," *id.*, Ex. 2-C, a fact that CBP's own declarations acknowledge, *see* Howard Initial Decl. ¶ 26(a).

The Court agrees that CBP has not adequately explained why it need not search the Office of Congressional Affairs. At the outset, the congressional appropriation documents that Stevens has produced suggests that the Office of Congressional Affairs is reasonably likely to have responsive documents. And as Stevens points out, CBP's search in response to part one was limited to communications involving Underwood and her staff. It would not necessarily uncover all documents responsive to parts two and three—which more broadly seek records relating to an electronic health record system for CBP, whether or not they involve Underwood or her staff.

It is possible that CBP's search efforts in response to part one were in fact broad enough to cover parts two and three as well, but that is not clear from Howard's initial declaration, the basis for the Court's previous summary judgment ruling. The declaration does suggest that CBP applied "EHR," "Health Record," and "Electronic health record" as search terms apart from "Underwood" and "Lauren Underwood." *See* Howard Initial Decl. ¶¶ 29, 31. But it also clearly frames its search as targeted specifically at "communications with Representative Underwood or her staff about

30

electronic health records systems." *See id.*

Reading Howard's initial declaration as a whole, it does not clearly establish either way whether CBP's search in response to part one of Stevens's request also constituted an adequate search in response to parts two and three. If CBP wishes to rely solely on its search in response to part one instead of conducting a new search of the Office of Congressional Affairs, it must show that its previous search was reasonably calculated to uncover all documents responsive to parts two and three of Stevens's request. That will likely require an explanation of whether the locations searched would likely contain all documents responsive to parts two and three, rather than only those involving Underwood and her staff; whether the search terms for electronic health records were used separately from the search terms related to Underwood; and whether CBP considered all documents concerning electronic health records responsive in determining which documents to produce. Alternatively, CBP may attempt to establish at trial that this office is not reasonably likely to contain documents responsive to the narrowed search specified above.

### 2. The Office of the Commissioner

The parties seem to agree that the Office of the Commissioner is likely to have responsive records. CBP tasked this office initially, which led to a search of one custodian that contributed to the unmanageable universe of records. Now that it has been identified as a specific location of interest, CBP should apply the search parameters specified above to the potentially responsive documents already identified from this office and describe the methodology and results of that specific search with reasonable particularity. The Court grants Stevens's motion to this extent. *See* Fed. R.

31

Civ. P. 56(g).  Any remaining disputes regarding this office—for example, whether the resulting documents would be unduly burdensome to process—are matters for trial.

Regarding the three sub-offices of the Office of the Commissioner specifically identified by Stevens, CBP relies upon its previous taskings, but the documents returned from those taskings were never reviewed or produced because of the parties' disagreement over how to narrow the universe.  Now, the search parameters specified above provide a narrower search that CBP can apply to the documents from each of the three sub-offices.  CBP also points out that it conducted additional outreach to the sub-offices, which responded that they were not reasonably likely to have responsive records.  But the only description of this outreach is in Howard's supplemental declaration, which provides no detail regarding how the sub-offices reached their conclusions.

If CBP wishes to rely on these supplemental outreach efforts, it must show at trial that the sub-offices' responses were based on an adequate search for responsive documents.  Alternatively, CBP may attempt to establish at trial that these particular sub-offices are not reasonably likely to contain documents responsive to the narrowed search specified above.

### 3. The Office of Acquisition

As with the Office of the Commissioner, the parties agree that the Office of Acquisition contains potentially relevant documents.  Moreover, Howard's initial declaration avers that "[a]ny work with outside persons or companies to develop the health records data described in the FOIA request would have to go through CBP's Procurement office[,] part of the CBP Office of Acquisition."  Howard Initial Decl. ¶ 26(c).

32

That is reflected in the results of CBP's initial tasking of the Office of Acquisition. According to CBP, the office provided a comprehensive list of custodians, and a search of those custodians yielded 2.3 million pages of records.

Here too, CBP should apply the search parameters specified above to these documents. The Court grants Stevens's motion to this extent. Stevens also requested a search of any sub-offices of the Office of Acquisition not previously searched. CBP responds that its initial tasking resulted in a comprehensive list of custodians. Any disputes regarding whether the list of custodians from the initial tasking encompassed all locations reasonably likely to contain documents responsive to the narrowed search specified above, or whether certain custodians' documents should be excluded from that narrower search, are matters for trial.

### 4. The Office of International Affairs

CBP has declined to search the Office of International Affairs because it believes the office "has no probable link to electronic health records." DSOF ¶ 12. Stevens, however, points out that a U.S. Immigration and Customs Enforcement webpage describes a Biometric Identification Transnational Migration Alert Program (BITMAP), a program that "aims to strengthen law enforcement investigation, border security and counterterrorism efforts in the U.S. and in partner nations by providing foreign law enforcement with biometric / biographic collection capability." Pl.'s App'x Mot. for Summ. J., Ex. 2-F. She argues that this suggests that the electronic health records system she seeks might relate to international affairs. CBP's only substantive response is that "BITMAP does not sound like something that relates to electronic medical records." CBP's Reply at 6–7. That is insufficient to carry the day on summary

33

judgment.  CBP may be able to show at trial that BITMAP is unrelated to electronic medical records, but at this stage its explanation is insufficient to entitle it to summary judgment.

### 5.      The Office of Information and Technology

Stevens argues that CBP should search the Office of Information and Technology, a sub-office in Enterprise Services.  She contends that there is a natural connection between electronic health systems and the office.  Moreover, she points out that CBP's most recent production includes an email chain which references an "Electronic Medical records effort" and includes an Office of Information and Technology employee.  *See* Pls.' Ex. 1-A at 105–11 of 152.  CBP's only response is that Stevens "does not explain what the supposed connection to electronic medical records is."  In the Court's view, Stevens's explanation is sufficient.  If CBP believes that the Office of Information and Technology is not reasonably likely to contain responsive records, CBP may attempt to establish this at trial by, for example, explaining the basis for its belief that the office would not be involved in the implementation of an electronic medical records system despite its responsibility over technology.

Finally, in Stevens's cross-motion for summary judgment, she asks the Court to order CBP to:  (1) release unredacted versions of its productions so far, and (2) provide contact information for officials with knowledge of the electronic health record contracts referenced in Stevens's request for the purpose of determining a new search to be conducted within fourteen days.  The Court denies this motion.  She is correct that CBP has not adequately justified its withholdings so far, but CBP has made clear that it needs time to justify those withholdings at trial.  Ordering CBP to unredact its

34

documents at this stage would be premature. The second part of Stevens's proposal is unrealistic and comes far too late. CBP has not adequately explained its refusal to apply Stevens's proposal in the 2/5/26 JSR, but the solution is to require CBP to apply that proposal, as modified in this order, not restart the case on Stevens's new terms.

### Conclusion

In conclusion, the Court denies HHS and CBP's motion for summary judgment [dkt. 212]. The Court also denies Stevens's cross motion for summary judgment against CBP [dkt. 219, 221] but has made, under Fed. R. Civ. P. 56(g), certain findings favorable to Stevens. The parties should be prepared at the status conference on May 22 to discuss the upcoming trial, including any issues to be addressed and the witnesses likely to be called.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 21, 2026