**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JACQUELINE STEVENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 22 C 5072** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HEALTH AND HUMAN SERVICES, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

MATTHEW F. KENNELLY, District Judge:

This case concerns Freedom of Information Act (FOIA) requests by Jacqueline Stevens, a political science professor at Northwestern University, to various federal agencies. Currently before the Court are the remaining issues concerning Stevens's FOIA requests to the United States Department of Health and Human Services (HHS) and Customs and Border Protection (CBP). On June 22, 2026, the Court conducted a bench trial regarding the adequacy of the agencies' search efforts and the propriety of their withholdings. This decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

**Facts**

This case started on September 16, 2022 and originally involved thirteen FOIA requests to seven agencies. By the end of 2025, the case had largely been narrowed to

two requests, one to HHS and one to CBP.[1]  On May 21, 2026, the Court denied the parties' cross-motions for summary judgment but made rulings defining the issues for the bench trial.  *Stevens v. U.S. Dep't of Health & Hum. Servs.*, No. 22 C 5072, 2026 WL 1430485 (N.D. Ill. May 21, 2026).

**A.     CBP**

The request to CBP was originally directed to the Department of Homeland Security (DHS).  DHS transferred the request to CBP before this litigation, a decision not at issue in this case.  The request concerned three categories of records.  Part one sought:

> All communications and related materials created, received, or maintained by the Department of Homeland Security to which Rep. Lauren Underwood (D-IL) or any member of her staff were a party.  This includes but is not limited to all email, text messages, notes, reports, memorandums, proposed bill texts, and bill evaluations.

Pl.'s Ex. (PX) 2 ¶ 1.  For this part, Stevens identified a particular statement she was interested in:

> Please note that in a floor speech of 9/26/2019[,] Rep. Underwood stated she received information from the "Department of Homeland Security" indicating a request for an integrated Electronic Health Records System she referenced as "EHR."  She refers to this in her remarks on HR 3525 as a "direct ask from medical officers at the Department of Homeland Security." [Link to bill text.]  (It is possible that she actually had in mind Immigration and Customs Enforcement but failed to make this explicit.  In the event, I am requesting all communications associated with this "direct ask.")

*Id.*  On August 30, 2024, the Court granted summary judgment in CBP's favor regarding this part of Stevens's request.  *Stevens v. U.S. Dep't of Health & Hum. Servs.*, No. 22 C

---

[1] There was one other outstanding issue concerning withholdings by Immigration and Customs Enforcement, which the Seventh Circuit has recently remanded for further consideration.  *Stevens v. U.S. ICE*, 178 F.4th 1097, 1102 (7th Cir. 2026).

5072, 2024 WL 4007684, at *11 (N.D. Ill. Aug. 30, 2024).  Since then, the litigation has focused on parts two and three of Stevens's request.  Part two asked for:

> DHS communications and related materials created by or received from other components of DHS or the Department of Health and Human Services Office of Refugee Resettlement about the use of Electronic Health Records systems already in place as well as the establishment of an EHR for the use by offices of CBP.

PX 2 ¶ 2.  And part three requested:

> Information on meetings and communications with private individuals, including but not limited to lobbyists or company officials related to past, current, or potential "enterprise" or other information technologies for collecting, coordinating, or maintaining health records data for those encountered or detained by DHS or any component of DHS. I have in mind technical reports, email, text messages, or other communications with the private sector tied to past, current, or potential contracts tied to EHR systems.

*Id.* ¶ 3.

### 1.    Search

After the August 30, 2024 summary judgment ruling, CBP searched for records responsive to part three in its Office of Acquisition.  Patrick Howard, a "Branch Chief" in CBP's FOIA Division, had submitted a declaration attesting that "[a]ny work with outside persons or companies to develop the health records data described in the FOIA request would have to go through the CBP's Procurement [O]ffice . . . within the Office of Acquisition."  Defs.' Ex. (DX) 2 ¶ 26(c).  CBP also tasked the following component offices to search for records responsive to parts two and three of Stevens's request:  (a) the Office of the Commissioner; (b) three enforcement offices—Field Operations, Border Patrol, and Air and Marine Operations; (c) a sub-office of Operations Support called the Office of the Chief Medical Officer (OCMO), which CBP thought was the location most likely to contain responsive records; and (d) Public Affairs.  CBP applied the following

search terms: "E.H.R."; "E.M.R."; "Electronic Health Record"; "Electronic Medical Record"; "EHR"; and "EMR." By early 2025, these searches had identified tens of millions of potentially responsive pages, and parts two and three of Stevens's request had effectively merged.

Over the next year, the parties could not agree on how to winnow down the universe of potentially responsive pages to a more manageable amount for CBP to process. CBP invited Stevens to propose additional search terms, but Stevens stated that she could not meaningfully narrow her request without more information about the makeup of the existing universe of documents. At one point, CBP proposed to apply the search term "General Dynamics" to the documents from the Office of Acquisition under 100 pages, which yielded 230 documents comprising 5,766 pages. Stevens agreed that CPB should process those pages, and the Court ordered CBP to do so at a rate of 750 pages a month. That took the better part of a year, and by the end of it, Stevens was unsatisfied, arguing that many of the pages that CBP produced had nothing to do with electronic health records. At another point, Stevens proposed fifteen new search terms. CBP applied those search terms to the entire universe of records, which yielded ninety-eight new documents that CBP produced on March 20, 2026.

The same day, CBP moved for summary judgment on the adequacy of its search, arguing that responding further to Stevens's FOIA request at that point was unduly burdensome. CBP did not move for summary judgment on whether it properly withheld material in its productions up to that point, instead stating that it would present at trial a *Vaughn* index explaining the basis for its withholdings. *See generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

4

On May 21, 2026, the Court denied CBP's motion and instead ordered it to try a pending proposal by Stevens to apply the following sets of search terms to the documents 100 pages or fewer and from the year 2019 only:

(i)  "@generaldynamics.com"; "@gdit.com"; "@ervingraves.com"; "@cgagroup.com"; "@acgadvocacy.com"; "@harbingerdc.com"; "@pennavenue.com"; "@potadv.com"; "@teamsubjectmatter.com"; "@vsadc.com"; "@federalstrategies.com"; "@nelsonmullins.com"; "@meltsnerstrategies.com"; "@align-strategies.com"; "@bakerdonelson.com"

(ii)  "'EMR OR EHR' AND 'General Dynamics'"; "GD"; "GDIT"; "3525"

(iii)  "Underwood"; members of her staff on the House Committee on Homeland Security (*last names only*).

*Stevens*, 2026 WL 1430485, at *13.  The Court also ordered CBP to "provide enough information about its methodology to facilitate meaningful review," ideally including "a breakdown of which locations and search terms yielded what number of potentially responsive documents."  *Id.*  The Court reserved for trial the question of whether and to what extent CBP still needed to search the following locations for documents responsive to parts two and three of Stevens's request:  (1) the Office of Congressional Affairs (OCA); (2) two sub-offices within the Office of the Commissioner—the Policy Office and the Office of the Intergovernmental Public Liaison; (3) the Office of International Affairs (OIA); and (4) the Office of Information and Technology (OIT).  *Id.* at *14–16.

Howard's trial declaration and testimony provided information in response to the Court's summary judgment order, as well as additional detail clarifying CBP's pre-summary judgment search efforts.  Starting with CBP's pre-summary judgment search efforts, Howard discussed each office that the agency initially searched.  Howard testified that neither Field Operations nor Air and Marine Operations had responsive

records because their enforcement responsibilities are not connected to health records. According to Howard, Field Operations facilitates legitimate trade and travel at ports of entry and airports, and Air and Marine Operations generally conducts field work in a support role, like tracking individuals through air helicopter support or rope rescues. Howard also testified that Public Affairs determined that it had no responsive records, and he provided some detail on how it reached that determination. According to Howard, CBP sent Public Affairs a copy of Stevens's FOIA request and told it to focus specifically on parts two and three. Public Affairs then ran keyword searches through its SharePoint sites and correspondence and was unable to locate any records.

Howard also provided more information at trial about OCMO and the Office of Acquisition, both of which contributed significantly to the initial large set of records. He testified that OCMO identified a high-level individual, who in turn identified seventeen custodians that would capture essentially the full nexus of anything that had to do with the electronic health records system at issue. One of those custodians came from Border Patrol. Several others came from the Office of Acquisition and OCMO itself. Howard also testified that the Office of Acquisition initially identified one person, who then identified three more. And after that, according to Howard, CBP identified eight additional people. So, in total, there were three sets of custodians from these offices: four from the Office of Acquisition, another eight from the Office of Acquisition, and seventeen from OCMO.

Turning to the CBP's post-summary judgment efforts, Howard's trial declaration provides the results of the summary judgment proposal, including document or page counts associated with the new search terms, except for the Office of the

6

Commissioner, which has not yet provided an update.  For example, Howard attests that CBP initially identified three Underwood staffers and searched for responsive documents using each staffer's last name or, in the case of a common last name, the staffer's full name.  According to Howard, this led to a second set of staffers, then a third.  He attests that CBP has produced the documents from the first two sets and that the third set resulted in false hits.  Howard testified that CBP considered its search based on Underwood's staffers to be complete.  Additionally, Howard's trial declaration and testimony addressed the four additional locations that the Court had reserved for trial.

*OCA*.  Howard testified that the day before the trial, OCA advised that it had records potentially responsive to part two of Stevens's request from briefing Congress on the systems.  According to Howard, those were roughly a handful of records that, based on a skim, appeared to be from 2022 to the present.  Howard further testified that OCA was very clear that it did not have records responsive to part three of Stevens's request because it does not correspond with outside entities.

*Office of the Commissioner Sub-Offices*.  Howard's trial declaration attests that the Policy Office "searched its repository of policies signed by the Commissioner using the following term[s] [sic]:  'Electronic Health Records,' 'Electronic Medical Records,' 'EHR system,' 'EMR system,' and 'Health records system acquisition,' and 'Medical records system acquisition.'"  DX 4 ¶ 28.  That search returned no responsive records. Likewise, his declaration avers that the Office of Intergovernmental Public Liaison applied the same terms to its SharePoint site, where it stores all documents, and found no responsive records.

7

*OIA*.  According to Howard, OIA "reported that they [sic] do not oversee, participate in, or manage any part of the apprehension, enrollment, or processing of individuals in any CBP electronic health records system and it does not communicate with foreign governments regarding the enrollment of aliens in any EHR system." *Id.* ¶ 30.  OIA thus reported that it "would not have any records responsive to [Stevens's] request." *Id.*  Howard further testified that CBP asked OIA to search, it answered that it had nothing, and, in his view, there was no reason to think otherwise.

*OIT*.  Howard's trial declaration states that CBP reached out to OIT, who responded that it was not involved in setting up an electronic health records system but did have two touchpoints.  One, the Records and Information Management Directorate worked on a draft retention plan.  Howard testified at trial that he planned to have that pulled for evaluation.  Two, Enterprise Infrastructure and Operations Directorate might have work tickets that mention the electronic health records system.  Howard testified, however, that based on his previous experience working on CBP's help desk, those tickets would not be related to the implementation or use of the system.  Instead, according to Howard, they would essentially be day-to-day requests for technological assistance.

## 2.    Withholdings

As discussed, CBP did not move for summary judgment on its withholdings, stating that it needed more time to prepare a *Vaughn* index.  Given the quantity of documents at issue, the *Vaughn* index only contains a representative subset of documents that the parties coordinated on.  The *Vaughn* index contains documents with withholdings under five statutory exemptions—exemptions 4, 5, 6, 7(C), and 7(E).  At

trial, Stevens challenged one additional document not on the *Vaughn* index, which contains partial withholdings under exemptions 6 and 7(C).  PX 9.  The parties agreed at trial that the Court's findings on the withholdings would apply across the documents already processed.

**B.     HHS**

Stevens's request to HHS seeks four categories of "records [from January 1, 2010 to January 22, 2017] tied to the hiring, transfers, and scope of work performed by Lauren Underwood at HHS[,] [who] is at present a member of Congress":

> 1) all position announcements associated with any jobs she held at HHS.
> 2) all reports, memorandums, or analyses she produced, including but not limited to her work on Ebola and other emergency public health matters.
> 3) all travel itineraries.
> 4) all expense reports.

Compl. ¶ 20; *see* PX 1 at 1.  From December 2022 to July 2025, HHS reviewed and produced documents in thirty monthly interim responses.  HHS provided Stevens with a declaration from Brandon Lancey, a "Lead Government Information Specialist" in HHS's Office of the Secretary, describing this part of the search.  DX 7.  After a dispute over whether HHS's search was reasonably calculated to uncover *all* responsive records, the parties agreed that HHS would conduct a supplemental search for position announcements and expense reports, which resulted in two more productions.  HHS provided a second declaration from Lancey, which added more information regarding HHS's initial search and described the agency's supplemental search.  DX 8.  HHS then moved for summary judgment on the adequacy of its search and the appropriateness of its withholdings.

### 1. Search

On May 21, 2026, the Court denied HHS's motion for summary judgment on the adequacy of its search, finding that Lancey's first two declarations left open genuine disputes of material fact. *Stevens*, 2026 WL 1430485, at *8–12. For the bench trial, HHS produced a third declaration from Lancey, who also testified. *See* DX 9.

### i. Position announcements

In its summary judgment opinion, the Court identified three issues regarding HHS's description of its search for position announcements. First, Lancey's summary judgment declarations stated that HHS—in coordination with the Office of Human Resources and the Administration for Strategic Preparedness and Response (ASPR)— initially searched its "official personnel and staffing systems that maintain records relating to federal employees' appointments, position classifications, and hiring documentation[,] using identifiers associated with Ms. Underwood, including her name, position titles, and organizational affiliations." DX 8 ¶ 10. The Court determined that this description lacked sufficient information to grant summary judgment. *Stevens*, 2026 WL 1430485, at *9–10. One problem, for example, was that Stevens had argued that HHS should have searched ASPR, where Underwood had been employed during the relevant time frame, but the Court could not tell from the declarations whether HHS had done so and if not, why not. *Id.* at *9.

Second, the summary judgment declarations referenced another FOIA request filed by (apparently) someone other than Stevens in 2019 that also sought Underwood-related employment and travel records (request 656). For employment records related to Underwood, request 656 sought: "job description[s]"; "all employment records,

10

including her resume, dates of hire, promotion and leave, all job titles held, and the circumstances of her departure"; and her "personnel file, including any disciplinary actions, complaints filed by or against her, and employer performance reviews."  DX 7. It was unclear to what extent HHS had conducted a separate search in response to Stevens's request at issue in the present case.  *Id.* at *10.  The Court reasoned that if HHS was relying on a previous search conducted in response to request 656, it needed to show that those efforts would also be an adequate response to Stevens's request. *Id.*

Third, the summary judgment declarations stated that HHS had supplemented its initial search with additional outreach to Human Resources, which responded that responsive position announcements were no longer maintained, citing a 2017–2018 transition to a new version of USA Staffing—a government hiring system— as well as a three-year retention policy for vacant announcement records.  The problem was that the declarations also attested that HHS had produced ninety-two records in December 2022 and January 2023, and the Court could not tell from the face of the declarations whether this set contained position announcements, which would have suggested that some responsive records survived.  *Id.* at *9.

Lancey's trial declaration and testimony speaks to all three issues.  First, Lancey testified that the initial search involved three systems:  the Enterprise Human Capital Management System, an electronic official personnel folder, and USA Staffing. According to his trial declaration and testimony, ASPR also concluded at this time that it did not have any responsive position announcements because records related to a hiring decision for a political appointee, like Underwood, are destroyed when she leaves

11

the government. *See* DX 9 ¶ 9. Lancey testified that Human Resources did not know what exact search terms were used in its initial search but that the standard approach for this type of search would be to use the employee's name along with the employee's ID and social security number. Lancey further testified that Human Resources went back and searched USA Staffing using Underwood's name, which yielded no responsive records.

Second, Lancey attests that the initial search was conducted in response to Request 656, which he characterizes as "similar . . . but much broader." *Id.* ¶ 11. This yielded 105 pages of Underwood-related employment records (which have been produced to Stevens), but not any position or vacancy announcements. Lancey testified that, for reasons of efficiency, HHS often uses documents processed for one FOIA request to respond to another FOIA request. He also testified that there was some confusion over which request was at issue at the start of this litigation.

Third, Lancey clarified in his trial declaration and testimony that the set of ninety-two documents that raised questions at summary judgment were travel records, not position announcements. *Id.* ¶ 12.

### ii. Work product

In response to Stevens's request for "all reports, memorandums, or analyses [that Underwood] produced, including but not limited to her work on Ebola and other emergency public health matters," HHS searched "Ms. Underwood's HHS email account [for] all emails, including attachments, that she sent or received" in the relevant time frame. DX 7 at 3–4. At summary judgment, the Court observed that the FOIA request sought work product that Underwood *produced*, not just the work that she

shared with others. *Stevens*, 2026 WL 1430485, at *11. The Court therefore concluded that HHS also had to search, or justify its decision not to search, shared drives, local hard drives, and other folders reasonably likely to contain Underwood's work product. *Id.*

Lancey's trial declaration states that in June 2026, he "directed the Office of the Chief Information Officer" (OCIO) to search "Underwood's network drive and her OneDrive" with the following search terms: "report* OR memorandum OR memoranda OR memo* OR analys* OR assessment* OR briefing OR white paper* OR recommendation* OR review* OR Brief* OR finding* OR ebola OR 'health emergency' OR 'health emergencies.'" DX 9 ¶ 5. According to Lancey, this returned 21,897 files, roughly 8,000 of which were unique. He testified that he personally conducted a search within those files for "Lauren" and "Underwood" as the author. "Lauren" yielded sixty documents, excluding those authored by a "Lauren" whose last name is known not to be "Underwood." "Underwood" yielded 577 documents. According to Lancey, those numbers could be lower after deduplication.

Lancey also testified that he asked ASPR to search its shared drive for documents with "Underwood" as the author. According to Lancey, that search yielded no responsive records.

### iii. Travel documents

At summary judgment, HHS's description of its search for travel itineraries and expense reports left open similar issues as its description of its search for position announcements. First, the summary judgment declarations lacked sufficient information about what locations HHS searched and what search terms, if any, it used. *Stevens*,

13

2026 WL 1430485, at *11–12.  Second, the declarations stated that HHS had conducted additional outreach to the Immediate Office of the Secretary, Office of Business Operations (IOS / OBO) and concluded that office would not have responsive records for the relevant time frame due to system transitions in 2015 and a six-and-a-half-year retention schedule for travel records.  But as with the position announcements, the set of ninety-two pages produced in 2022 and 2023 created ambiguity on whether some travel records might still exist.

In his trial declaration, Lancey states that those ninety-two pages were travel documents that ASPR located in 2019.  They comprised documents that ASPR had located through a search of its travel system, as well as documents ASPR had located in response to Request 656, which asked for "all expenses reimbursed to Ms. Underwood by the federal government," "all federally funded travel records and corresponding receipts," and "all gift or travel disclosures filed during her tenure."  DX 7 at 3.  Lancey attests that he reviewed the ninety-two pages and that the earliest records were from 2015, within the six-year retention period at the time of the 2019 search.  He further testified that he asked ASPR what systems it searched in 2019, in part to see if there are pre-2015-transition systems that could still be searched, but is still waiting for an answer.

The declaration also states that the search of Underwood's emails yielded travel-related records that have been produced.  After the Court's summary judgment ruling, Lancey tasked OCIO to search Underwood's network drive and OneDrive for "'expense report' OR 'expense reports' OR 'travel schedule' OR 'travel agenda' OR 'travel itineraries' OR 'travel itinerary' OR travel within 2 words of itinerary."  DX 9 ¶ 6.  The

14

results of that search are still pending. Lancey testified that HHS will provide an update with the number of files and number of pages that need to be processed once the search is complete. *See id.* To date, no update has been provided to the Court.

### 2. Withholdings

At the summary judgment stage, HHS asserted that it had properly withheld material under statutory exemptions in its productions up to that point. Stevens raised two points in response. First, she questioned why only roughly 1,000 pages were produced even though HHS reviewed nearly 19,000. HHS replied that the rest were unresponsive. Second, Stevens requested *in camera* review of one specific email.

Before trial, the Court granted HHS's motion for summary judgment on its withholdings up to that point, except as to the one contested email, which the Court has now reviewed *in camera*.

### Discussion

FOIA's fundamental purpose is to provide public access to government documents, "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d 381, 386 (7th Cir. 2015) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "Toward that end, FOIA provides that agencies 'shall make . . . records promptly available to any person' who submits a request that '(i) reasonably describes such records and (ii) is made in accordance with [the agency's] published rules,'" subject to enumerated exceptions. *Id.* (quoting 5 U.S.C. § 552(a)(3)(A)). FOIA confers jurisdiction on district courts to "enjoin the agency from withholding agency records and to order the

15

production of any agency records improperly withheld."  5 U.S.C. § 552(a)(4)(B).

An agency may improperly withhold records by responding inadequately to the request.  *U.S. DOJ v. Tax Analysts*, 492 U.S. 136, 151 n.12 (1989).  A FOIA requester may challenge the adequacy of the agency's search for responsive records.  *Rubman*, 800 F.3d at 386–87.  A FOIA requester may also challenge the agency's decision to withhold responsive records under the statutory exemptions.  *Id.* at 386.  For either type of challenge, the agency bears the burden "to sustain its action."  5 U.S.C. § 552(a)(4)(B).

A.    CBP

1.    Search

An agency's duty under FOIA is to conduct a good faith search that is reasonable in light of the request.  *Rubman*, 800 F.3d at 387.  Good faith is presumed and can be bolstered by evidence of the agency's efforts to satisfy the request.  *Id.* "Reasonableness is a flexible and context-dependent standard."  *Id.*  An agency's search is generally reasonable if it employs "'methods which can be reasonably expected to produce the information requested,'" even if the agency still "*might* have additional, unidentified responsive documents."  *Id.* (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  As evidence, the agency may rely upon "reasonably detailed nonconclusory affidavits" describing its search.  *Id.*  A requestor may respond with "positive indications of overlooked materials," such as leads that the agency unreasonably failed to pursue.  *Id.*; *see White v. U.S. DOJ*, 16 F.4th 539, 544 (7th Cir. 2021); *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996).

CBP has met its burden.  To identify responsive records, CBP has searched or

16

consulted:  the Office of the Commissioner, including the Policy and the Intergovernmental Public Liaison sub-offices; Field Operations; Border Patrol; Air and Marine Operations; OCMO; Public Affairs; OCA; OIA; and OIT.  CBP has also negotiated with Stevens for multiple years to find ways to narrow the search to a manageable number of documents.  And in full compliance with the Court's May 2026 summary judgment ruling, CBP applied Stevens's last-minute proposal, detailed its results, and provided updated explanations for why some offices determined that they lacked responsive records.  CBP's substantial efforts to respond to Stevens's request demonstrate good faith and are reasonably calculated to uncover responsive documents.

In an attempt to show otherwise, Stevens challenged several aspects of CBP's search methodology during her cross-examination of Howard.  None of her questioning undermined the adequacy of CBP's search.  Stevens elicited testimony that CBP did not consult directly with certain people, such as the senior medical advisor, the chief medical officer, or members of Underwood's staff.  But an agency does not have to consult with any particular people; the requirement is to conduct a search reasonably calculated to uncover relevant documents, which CBP has done by identifying and searching offices and custodians that would have responsive documents.

Second, Stevens questioned Howard on his knowledge of the electronic health records system.  For example, she elicited testimony that Howard was not personally aware of which agencies had access to the system or which companies had contracts related to it.  But even without knowing those details, CBP could still reasonably determine which offices were likely to be involved, by the nature of each office's

responsibilities. Moreover, Howard's personal knowledge is immaterial because CBP conducted its search based on the knowledge of others more familiar with the health records system, such as the high-level individual in OCMO who identified seventeen custodians who would capture the full nexus of the system.

Third, Stevens argued that Howard lacked sufficient knowledge of how the offices that CBP tasked conducted their local searches in response to CBP's taskings. This seems to refer to a part of Howard's testimony where he acknowledged that CBP does not have access to other office's records and relies on those other offices to identify appropriate custodians. But the fact that CBP does not have access to every office's records in a centralized database is not objectionable. FOIA does not require an agency to reorganize its files. *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1038 (7th Cir. 1998) (citing *Church of Scientology v. IRS*, 792 F.2d 146, 150–51 (D.C. Cir. 1986) (Scalia, J.)). And it was reasonable for CBP to conduct its search by tasking other offices, which have expertise with their own files. Howard's testimony also provided sufficient detail for the Court to determine that the taskings and searches were done reasonably and in good faith. For example, he testified that CBP provided each office with a copy of the request and specific instructions to look at sections two and three. He also testified that the offices searched for variations of EHR and EMR, which CBP provided over email. And he further testified that CBP obtained custodian names from high-level supervisors.

Fourth, Stevens challenged CBP's determination that several offices did not have responsive records. For the Office of Intergovernmental Public Liaison, she pointed out that an executive director from that office was copied on a memorandum from the Chief

18

Financial Officer. Howard, however, explained that documents like that are frequently distributed to various staff and that offices only keep documents that they themselves control or created.

Stevens also testified at the trial that she believed that OIA was likely to have responsive records based on a Biometric Identification Transnational Migration Alert Program (BITMAP). According to an Immigration and Customs Enforcement webpage, that program is run by Homeland Security Investigations International Operations and involves "train[ing] and equip[ping] foreign counterparts to conduct tactically targeted collection of biometric and biographic data on suspect individuals via mobile biometric collection devices." *Biometric Identification Transnational Migration Alert Program*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/hsi/our-offices/hq/bitmap (Feb. 20, 2026). From this description, it is not clear whether CBP would have records related to BITMAP, nor is it apparent that BITMAP has anything to do with the health records system at issue in her FOIA request to the agency. Stevens's suspicions, without more, are not enough for the Court to second guess OIA's representation that it does not oversee or participate in any part of the apprehension or enrollment process, does not process individuals, and does not have any nexus to the health records system.

Fifth and finally, Stevens seems to take issue with the fact that CBP's searches are still in progress. That is a reflection of this case's protracted procedural history, for which Stevens bears part of the responsibility. It does not cast doubt on the good faith or reasonableness of CBP's efforts. It is possible that CBP's pending searches may uncover additional leads. And it is generally true that an agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge

19

during its inquiry." *Campbell v. U.S. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998). But this principle, in line with the flexible and context-specific nature of the reasonableness standard, comes with limits. And the purpose of trial here was to finally settle on what CBP needs to do and what it does not. Unless CBP's pending searches produce a "clear and certain" lead that it "cannot in good faith ignore," CBP's efforts, once complete, are enough. *See Kowalczyk*, 73 F.3d at 389. If Stevens is not satisfied, she may of course file another FOIA request. *See Rubman*, 800 F.3d at 392.

### 2. Withholdings

FOIA exempts from disclosure certain categories of information. 5 U.S.C. § 552(b). Because FOIA is interpreted in favor of disclosure, its exemptions are construed narrowly. *Tax Analysts*, 492 U.S. at 151. That said, Congress intended for the exemptions to provide "workable rules," *U.S. DOJ v. Landano*, 508 U.S. 165, 180 (1993) (internal quotations omitted), with "meaningful reach and application," *John Doe Agency v. John Doe Corp*, 493 U.S. 146, 152 (1989).

The agency bears the burden of justifying its decision to withhold documents pursuant to an exemption. *Vidal-Martinez v. U.S. DHS*, 84 F.4th 743, 747 (7th Cir. 2023). This involves, of course, establishing that the withheld information falls within one of the exemptions. But following a 2016 amendment, the agency must also "'reasonably foresee[] that disclosure would harm an interest protected by' the FOIA exemption." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). This is an "independent and meaningful burden" requiring agencies to "concretely explain how disclosure 'would'—not 'could'— adversely impair [an exemption's protected interest].'" *Id.*; *Fogg v. IRS*, 106 F.4th 779,

20

788–89 (8th Cir. 2024). Additionally, an agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II). The foreseeability and segregability requirements dovetail: "[e]ven if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024).

To meet its burden, an agency may rely on a *Vaughn* index describing the withheld documents and its basis for withholdings. If the agency's justifications appear facially adequate, the plaintiff must bring contested issues into focus by "identify[ing] with particularity the claims of exemption [s]he [is] challenging." *Henson v. Dep't of Health & Hum. Servs.*, 892 F.3d 868, 876 (7th Cir. 2018). Here, CBP has produced a *Vaughn* index for a representative sample of documents put together by the parties. The index contains withholdings under exemptions 4, 5, 6, 7(C), and 7(E). The Court addresses each type of exemption in turn.

### i.     Exemption 4

Exemption 4 safeguards "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Information that is "both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy" qualifies as "confidential" under this exemption. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

The *Vaughn* index lists one withholding under exemption 4, for a contract

modification document dated August 19, 2014. The *Vaughn* index states that exemption 4 was applied to redact pricing information obtained from a CBP contractor that the contractor "would not ordinarily make available to the public." DX 5 at 13. The index states that "disclosure of such information would reveal nonpublic commercial information . . . or may be used to reverse engineer the contractor's proprietary technical approach under a government contract." *Id.* Howard testified that CBP generally makes total winning bids public but redacts how much a contractor bids for specific aspects, in order to protect information that could allow competitors to undercut them. Stevens has produced the redacted document, which matches CBP's description. *See* PX 31.

The Court concludes that CBP has adequately established that exemption 4 applies, that it would prevent a reasonably foreseeable harm of the nature that exemption 4 is meant to protect, and that all reasonably segregable information has been produced.

### ii. Exemption 5

Under exemption 5, as relevant here, an agency may withhold "inter-agency or intra-agency memorandums or letters that would not be available by law . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 "incorporates the privileges available to Government agencies in civil litigation." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021). As relevant here, this includes the deliberative process privilege, which "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* (quoting *NLRB v. Sears,*

22

*Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  The purpose of the privilege is to ensure that government officials can communicate candidly among themselves in reaching their decisions.  *Id.*

In accordance with that rationale, the privilege applies only to documents that are "predecisional" and "deliberative."  *Id.* at 268.  "Documents are 'predecisional' if they were generated before the agency's final decision on the matter."  *Id.*  And they are "'deliberative' if they were prepared to help the agency formulate its position."  *Id.*  So, for example, the deliberative process privilege protects "all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be."  *Nat'l Immigr. Just. Ctr. v. U.S. DOJ*, 953 F.3d 503, 508 (7th Cir. 2020) (quoting *Sears*, 421 U.S. at 153).  That includes proposals, recommendations, and drafts that reflect the "give-and-take . . . of the deliberative process."  *Abtew v. U.S. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015) (Kavanaugh, J.); *see Malone v. U.S. Pat. & Trademark Off.*, 175 F.4th 262, 268–69 (4th Cir. 2026).  In contrast, it does not protect documents that functionally "communicate[] a policy on which the agency has settled," "because once a decision has been made, the deliberations are done."  *Sierra Club*, 592 U.S. at 268.  It also does not protect "purely factual material" that is "severable" from "deliberative or policy-making processes."  *EPA v. Mink*, 410 U.S. 73, 87–89 (1973).

In addition to these general boundaries, outside of FOIA the deliberative process privilege may be overcome by a sufficient showing of particularized need.  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).  This qualification does not apply in FOIA cases because "the particular purpose for which a FOIA plaintiff seeks information is not

23

relevant in determining whether FOIA requires disclosure." *Id.* at 737 n.5 (citing *Sears*, 421 U.S. at 149 n.16; *Mink*, 410 U.S. at 86; *U.S. DOJ v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 771–72 (1989)).

The *Vaughn* index lists five documents withheld under exemption 5, all of which were withheld in full. One is a 44-page document described as a "Draft Acquisition Plan for Remote Video Surveillance System Upgrade at the Southwest Border" dated May 2017. DX 5 at 2. Another is an 89-page document described as a "Draft Remote Video Surveillance System Upgrade at Southwest Border Market Research Report" dated March 31, 2017. *Id.* at 4. Howard testified that these documents are not related to health records and therefore not responsive to Stevens's request in the first place. In any event, CBP's decision to withhold these documents was based on substantially the same justification as CBP's decision to withhold the other three documents, which do reference an electronic health records system.

Those three documents all relate to appropriations: a "[s]even-page document market Draft / Pre-decisional - DHS Chief Medical Officer Coordinating Activities for FY 2020" and six-page and three-page "draft document[s] regarding the FY2020 DHS Appropriations." *Id.* at 10–11. All three have substantially the same justification: that the documents reflect internal agency deliberations regarding those appropriations and that disclosure "would create a chilling effect that would harm internal Agency open discourse, and could create public confusion in releasing non-finalized, pre-decisional records." *Id.* at 11–12.

That is somewhat boilerplate language, not the more "focused and concrete" explanation that courts have sometimes required. *Reps. Comm.*, 3 F.4th at 370; *see*

24

*Campaign Legal Ctr. v. U.S. DOJ*, 34 F.4th 14, 23 (D.C. Cir. 2022) ("To demonstrate that a document is deliberative, the government must explain the role it played in administrative decisionmaking—the 'who, what, where, and how' of internal governmental deliberations."). But in the Court's view, that is not fatal to the agency's assertion of privilege here. Howard reviewed the documents at trial and testified that they contained commentary and opinions. Disclosure of some types of communications, by their nature, come with a foreseeable chilling effect. *See Emuwa v. U.S. DHS*, 113 F.4th 1009, 1015–16 (D.C. Cir. 2024); *Rudometkin v. United States*, 140 F.4th 480, 493 (D.C. Cir. 2025). Draft documents containing non-final opinions on how to allocate government resources appear to the Court to fit that description.

CBP also did not expressly address segregability in its *Vaughn* index, but it is entitled to a presumption that it complied with the obligation to disclose reasonably segregable material. *See Rudometkin*, 140 F.4th at 494. That presumption is bolstered here by the fact that CBP appears to have complied with its segregability obligations in other documents. *See Stevens v. U.S. Dep't of State*, 20 F.4th 337, 345 (7th Cir. 2021). Moreover, on cross-examination, Howard testified that the appropriations documents did not contain factual information segregable from the shielded commentary and that, as a general matter, he still reviewed documents labeled as drafts.

Stevens raises several arguments more generally challenging CBP's application of the deliberative process privilege, but none are persuasive. At one point, Stevens seemed to suggest that CBP invoked the deliberative process privilege even for materials that never culminated in a final decision. But that is not objectionable: the privilege protects proposals that "die[] on the vine." *Sierra Club*, 592 U.S. at 268; *Sears*,

25

421 U.S. at 151 n.18.

Stevens also says the fact that CBP produced certain documents similar to those withheld suggest that CBP itself did not believe there was a privilege at issue. She seems to be referring to a 120-page document regarding a DHS Appropriations Act that was posted publicly despite having editing marks. *See* DX 5 at 11. This contention is also unavailing: "an agency does not forfeit a FOIA exemption simply by releasing similar documents in other contexts." *Emuwa*, 113 F.4th at 1018. Of course, the content of produced documents might provide evidence that calls into question the agency's decision to withhold similar documents. *See Army Times Publ'n Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1071–72 (D.C. Cir. 1993). But that is not the situation here. The production of the 120-page document provides no basis to think the other appropriations-related documents are not shielded by the deliberative process privilege. Indeed, there is a clear plausible explanation for why only the 120-page document was produced. The 120-page document—which is published on the website of the House of Representatives and appears to contain only superficial editing—may have functionally embodied a final decision. The other are far shorter—they include pages numbering only in single digits—and are more likely to be true drafts.

Stevens argues that CBP was required to conduct a balancing test and did not do so. As support for that requirement, she cites a rejected amendment to FOIA that would have exempted from disclosure "inter-agency or intra-agency memorandums or letters dealing solely with matters of law or policy." *See Mink*, 410 U.S. at 90. Whatever evidentiary value one places on this legislative history, it does not support Stevens's proposed balancing test for exemption 5. *Cf. Food Mktg. Inst.*, 588 U.S. at

26

436 ("[T]his Court has repeatedly refused to alter FOIA's plain terms on the strength only of arguments from legislative history."); *Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").  Congress's decision to reject this amendment "sensibly discarded a wooden exemption that could have meant disclosure of manifestly private and confidential policy recommendations simply because the document containing them also happened to contain factual data."  *Mink*, 410 U.S. at 91.  Instead, Congress adopted a "flexible, common-sense approach" permitting "discovery of purely factual material . . . that is severable without compromising the private remainder of the documents."  *Id.*  None of that suggests that the existing text of exemption 5 requires a balancing test for every assertion of the deliberative process privilege—an interpretation that the Supreme Court has squarely rejected.  *Id.* at 86; *Sears*, 421 U.S. at 149 n.16; *see also Reps. Comm.*, 489 U.S. at 778.

Finally, Stevens alluded to an exception to the deliberative process privilege that some courts have recognized when government deliberations are themselves the focus of civil litigation.  *See, e.g.*, *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998).  But that exception has been applied in non-FOIA cases where agency deliberations are central to the cause of action, such as equal protection claims.  *Id.*  It cannot sensibly apply in FOIA cases, where a requester can put agency deliberations directly at issue by simply requesting them, because it would effectively eliminate the deliberative process privilege from exemption 5.

### iii.     Exemptions 6 and 7(C)

Exemptions 6 and 7(C) cover different categories of documents but involve similar principles, so it is helpful to discuss them together.  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) shields "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  Both exemptions require courts to balance the public interest in disclosure against the privacy interests at stake.  *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495, 496 n.6 (1994) (citing *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *Reps. Comm.*, 489 U.S. at 776); *Baker v. FBI*, 863 F.3d 682, 684 (7th Cir. 2017).

Courts have approached this balancing through multiple steps. *See, e.g. Hum. Rights Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 713 (D.C. Cir. 2025); *Transgender L. Ctr. v. ICE*, 46 F.4th 771, 783–84 (9th Cir. 2022).  The government initially bears the threshold burden of establishing that there is a substantial, rather than trivial, privacy interest at stake.  This requirement is "not very demanding"—courts have consistently held that the privacy interest in an individual's name and address qualifies.  *Niskanen Ctr. v. Fed. Energy Regul. Comm'n*, 20 F.4th 787, 791 (D.C. Cir. 2021).  The burden then shifts to the person seeking disclosure to demonstrate some significant public interest to trigger a balancing inquiry.  *Higgs v. U.S. Park Police*, 933 F.3d 897, 904 (7th Cir. 2019).

28

The "'only relevant public interest in disclosure' to be weighed in this balance is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government*.'" *Fed. Lab. Rels. Auth.*, 510 U.S. at 495. That generally depends on the type of information requested, not the particular "purposes for which the request . . . is made" or "the identity of the requesting party." *Id.* at 496. Information about private citizens that "reveal[] little or nothing about an agency's own conduct" do not advance this purpose. *Id.* Additionally, the public interest must be "more specific than having the information for its own sake." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004).

Many of the withholdings in the *Vaughn* index are under exemptions 6 and 7(C). CBP essentially grouped the exemptions together and applied both to personally identifiable information of CBP's employees and its contractors' employees, such as their names, email addresses, physical addresses, phone numbers, and signatures. That was likely error: exemption 7(C) applies only to information compiled for law enforcement purposes, and many of the documents do not seem to fit that description. But this mistake is immaterial because CBP appropriately applied exemption 6, which covers "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6).

The Supreme Court has construed the phrase "similar files" broadly. *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982). It is not limited to "those records which contain information of the same magnitude—as highly personal or as intimate in nature—as that at stake in personnel and medical records." *Id.* at 598–602 (internal quotations omitted). Rather, "similar files" broadly includes information personal to a

29

particular individual, regardless of the form of the government record in which that information is stored. *Id.* at 601–02, 602 n.4. The personally identifiable information that CBP redacted falls within this definition.

By its text, exemption 6 requires a stronger showing that privacy interests outweigh the interest in disclosure than exemption 7(C). *Reps. Comm.*, 489 U.S. at 756. But again, the difference is not material. Under either standard, there is a nontrivial privacy interest in the personally identifiable information of the employees of CBP and its contractors. That is in part because their work relates to immigration, which is a controversial topic, especially today. *See Becker v. IRS*, 34 F.3d 398, 404 (7th Cir. 1994) ("[T]he nature of an employee's work may render release of personal information an unwarranted invasion of personal privacy."); *Hum. Rights Def. Ctr.*, 126 F.4th at 715 ("[T]he privacy interest at stake may vary depending on the context in which it is asserted."). To that point, Howard testified about a previous doxxing incident involving DHS employees. Stevens contends that this incident is unrelated to CBP, but the reality is that the same possibility exists for CBP employees. *See Hum. Rights Def. Ctr.*, 126 F.4th at 716. And under either standard, there is no substantial public interest to outweigh the privacy interests. CBP only redacted information for persons Howard described as rank-and-file employees. Disclosure of these employees' personally identifiable information will not shed light on what the agency is doing.

Steven asserts that there is a strong public interest in what she believes is a massive and apparently permanent database of biometric data from vulnerable individuals, including children. The Court does not question that public interest, but it has little bearing on the redactions at issue here. A strong public interest in issues like

30

whether such a system exists, how it operates, whose data it collects, and what that data is used for does not automatically translate into an equally strong public interest in the identities of everyone who discusses the system. *See Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006). And the redactions do not appear to affect the substantive content of the materials. *See In re Wade*, 969 F.2d 241, 246 (7th Cir. 1992). As a result, unredacting the identifying information is unlikely to advance the broader public interest in the system itself that Stevens relies on. *See Favish*, 541 U.S. at 172. The Court concludes that CBP properly withheld information under exemption 6, with two exceptions.

First, one document redacts the name of the Chief Medical Officer, who is a high-ranking official. Howard acknowledged at trial that redaction might be a mistake, as CBP's typical policy is to leave high-ranking officials' names unredacted.

Second, Stevens argued that CBP should have unredacted the domains in the email addresses. CBP did not articulate a privacy interest in the domains in particular, nor is it clear there is any. Unredacting the domains may advance the public interest in which agencies, agency components, and contractors are involved in the electronic health record system at issue. *See Transgender L. Ctr.*, 46 F.4th at 784. The Court therefore orders CBP to unredact email address domains in *responsive* documents. CBP need not unredact domains in documents that do not discuss the health record system. Aside from these two points, based on the Court's review of the partially redacted documents before it, CBP has complied with its duty to produce segregable information.

### v. Exemption 7(E)

Exemption 7(E) allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Based on the *Vaughn* index, CBP has applied this exemption to redact non-public internal coding and non-public, intra-agency group email addresses. According to the *Vaughn* index and Howard's testimony, leaving the coding unredacted "poses a risk to the integrity of CBP systems by allowing a violator to more easily navigate the system." *See* DX 5 at 10. Likewise, Howard testified that disclosing group email addresses would enable bad actors to flood the agency's emails with spam. Intuitively, it seems obvious that CBP should be able to redact this information. But it is an uncomfortable fit for the text of exemption 7(E), which is limited to "techniques," "procedures," and "guidelines for law enforcement investigations or prosecutions." The Court need not resolve whether this information is shielded under exemption 7(E) because the redacted information is not responsive to Stevens's request anyway. CBP therefore need not produce it.

### B. HHS

#### 1. Search

HHS's search efforts are also sufficient to satisfy its duty under FOIA. As an initial matter, there is no basis to find that HHS has not responded to Stevens's request

in good faith.  HHS initially responded to Stevens's request with thirty monthly productions, then acquiesced to Stevens's request to conduct supplemental searches, then thoroughly responded to the remaining issues identified at summary judgment. Turning to the issue of reasonableness, the Court previously denied HHS's motion for summary judgment on its search for position announcements and travel documents because its declarations left open genuine disputes of material fact.  *Stevens*, 2026 WL 1430485, at *8–10, *12; *see Rubman*, 800 F.3d at 387.  Lancey's trial declaration and testimony address those points and provide a clearer picture of HHS's efforts.

For position announcements, HHS initially produced documents that it had located in responding to request 656.  In that search, HHS searched the Enterprise Human Capital Management System, an electronic official personnel folder, and USA Staffing using keywords associated with Underwood—likely her name, ID, and social security number—producing 105 records but no position announcements.  HHS also determined that ASPR did not have any hiring documents related to Underwood because of its retention policy related to political appointees.  HHS supplemented this search by conducting additional outreach to the Office of Human Resources specifically for Stevens's request.  HHS determined that any responsive position announcements would no longer exist due to a USA Staffing program transition around 2017–2018 and a three-year retention policy for vacancy announcements.

HHS conducted a similar search for travel records.  It initially produced ninety-two pages that it located in 2019, comprising documents from a search of its travel system in response to Stevens's request, as well as documents from request 656.  HHS also conducted supplemental outreach to IOS / OBO, which led HHS to conclude that

33

its travel systems no longer contain responsive documents due to program transitions and a six-and-a-half year retention policy.  HHS has further reached out to ASPR to confirm whether any of the systems it searched in 2019 are still searchable.  As for other locations, HHS has produced travel records from Underwood's emails and is in the process of searching Underwood's network drive and OneDrive.

These searches are reasonably calculated to uncover responsive documents. HHS's initial decision to rely on its previous search in response to request 656 was not unreasonable given the similarities between the requests and the methodology used.  In any event, HHS reasonably determined that it no longer has any responsive position announcements due to program transitions and retention policies.  That satisfies its duty under FOIA.  *See Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) ("The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained."). Likewise, HHS has taken reasonable steps to confirm that it does not have any additional responsive travel documents.  HHS is still waiting to confirm whether ASPR has searchable travel systems.  If it does, then HHS should search those systems or explain why they are not reasonably likely to contain responsive records.  HHS is also still in the process of searching Underwood's drives—a decision that makes good sense given that some travel documents were found in Underwood's emails—with search terms that are reasonably calculated to uncover relevant documents.  Those efforts, combined with what HHS has already done, constitute a reasonable search under FOIA.

HHS had a different problem at summary judgment regarding its search for work

34

product.  HHS initially searched all of Underwood's emails but not any additional locations that may have contained work product that Underwood produced but did not share via email.  HHS is now in the process of searching Underwood's network drive and OneDrive.  Lancey attested to what exact search terms have been employed, and he further testified in detail to how he narrowed that universe to only those documents that Underwood produced.  These steps are reasonably calculated to produce responsive documents and, once complete, are sufficient to satisfy HHS's duty under FOIA.

Stevens has offered little to the contrary.  She has not produced countervailing evidence of overlooked materials.  And in her opportunity to cross-examine Lancey on the details of HHS's searches, nothing came up that undermined the reasonableness or good faith of its efforts.  First, Stevens elicited testimony from Lancey that HHS did not search for position announcements in Underwood's OneDrive or network drive.  Lancey, however, said that based on his FOIA experience position announcements are not reasonably likely to be in personal drives.  That is a reasonable, common-sense explanation.  Second, Stevens also elicited testimony that HHS did not use search terms specifically for Underwood's work on private insurance markets.  But that focus is nowhere in the original FOIA request, nor did it ever come up before trial.

Finally, Stevens at closing argument took issue with the fact that some of HHS's productions came right before trial and that some searches are still pending.  As with CBP, that merely reflects the procedural history of the case and the relatively short interval between the ruling on the last round of summary judgment motions and the trial.

   2.     **Withholdings**

The one withholding at issue for HHS requires little discussion.  It concerns an email which reads:  "I got promoted!  I'm now the Senior Advisor for Nicki in ASPR!  Yay—," followed by a little more than one line of text redacted under exemption 6.  The Court has reviewed the unredacted version *in camera*.  The redacted text does not contain personally identifiable information.  It is information that, in some sense, relates to Underwood's personal life, but the Court cannot see any nontrivial privacy interest in the information (nor can it see a nontrivial public interest).  Given that HHS bears the initial burden of establishing a privacy interest, it should unredact the email.

### Conclusion

In conclusion, the Court finds that CBP's search, once its pending tasks are complete, is adequate under FOIA.  The following tasks are still pending for CBP:

- Process at a rate of 500 pages per month the documents identified from applying the summary judgment search parameters.

- Provide the results of applying the summary judgment search parameters to the documents from the Office of the Commissioner.

- Finish processing the records from OCA briefing Congress on the electronic health records system.

- Acquire and process the draft retention plan identified by OIT.

The Court also finds that CBP has properly withheld material in the documents it has processed so far, except that CBP is ordered to do the following by no later than August 10, 2026:

- Review and unredact the name of the Chief Medical Officer on CPB 00299 of PX 13, or explain why the name was properly redacted.

36

- Unredact email domains in responsive documents.  Documents that do not pertain to the health records system are not responsive.

The Court finds that HHS's search, once its pending tasks are complete, is adequate under FOIA.  The following tasks are still pending for HHS:

- Provide an update on supplemental OCIO searches for work product and travel documents in Underwood's network drive and OneDrive.

- Provide an update on the pending inquiry to ASPR on whether it has travel systems that are still searchable.

The Court orders HHS to unredact the email address submitted for *in camera* review.

Finally, the parties are to meet and confer on next steps, including how to approach the issue remanded from the Seventh Circuit, and submit a joint status report (or competing proposals, if the parties cannot agree) by August 3, 2026.  CBP and HHS should include in the status report any post-trial updates on the above tasks.  A telephonic status hearing is set for August 6, 2026 at 9:10 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 20, 2026

37